**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **RITA FOSTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: CV-07-247-MHT** |
| | ) | |
| **JOSEPH A. LEE, JAMES** | ) | |
| **PARKER, LEON FRAZIER and** | ) | |
| **ALABAMA STATE** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS JOE A. LEE'S AND ALABAMA STATE UNIVERSITY'S
MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS**

COME NOW Defendants Joe A. Lee ("President Lee") and Alabama State University ("ASU"), pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and within the time allowed by this Court's Scheduling Order, and submit this Memorandum of Law in Support of Defendants' Motion for Judgment on the Pleadings.

**FACTS ALLEGED IN PLAINTIFF'S COMPLAINT**

Plaintiff Rita Foster ("Plaintiff") is a former employee of ASU.  (Compl. ¶¶ 3,8.)  In May 2003, Plaintiff began working as a Senior Secretary at the Acadome.  (Compl. ¶ 10.)  Plaintiff's coworker and fellow Senior Secretary was Renae Daniel

("Ms. Daniel"). (Compl. ¶ 10.) Both Plaintiff and Ms. Daniel worked for Defendant James Parker ("Mr. Parker"). (Compl. ¶ 10.) Plaintiff's duties included scheduling Mr. Parker's appointments and monitoring the Acadome budget. (Compl. ¶ 12.) In connection with her duties, Plaintiff questioned Mr. Parker about expenditures and responded to inquiries about Acadome budget expenses. (Compl. ¶ 16.)

On July 28, 2004, Mr. Parker reported that Plaintiff had falsified time sheets and left her desk without approval. (Compl. ¶ 24.) Following the complaint about her poor attendance, Plaintiff took a nearly three week leave of absence. (Compl. ¶ 25.) When Plaintiff returned, Mr. Parker followed up with Defendant Dr. Leon Frazier ("Dr. Frazier") on the status of his complaint against Plaintiff. (Compl. ¶ 26.)

ASU subsequently held a hearing on the charges against Plaintiff. (Compl. ¶ 27.) Plaintiff was apprised of the charges, responded to the allegations, and submitted evidence in her defense. (Compl. ¶ 27.) All the information was presented before a hearing officer who adopted the findings of Dr. Frazier and agreed with Dr. Frazier's suggestion that termination was appropriate. (Compl. ¶ 29.) Plaintiff was informed on or about March 3, 2005 that her employment was terminated and notified that she could appeal the decision to Joe Lee, the President of ASU. (Compl. ¶ 29.)

Plaintiff did appeal the decision and submitted additional evidence to President Lee on March 11, 2005. (Compl. ¶ 30.) After consideration of Plaintiff's additional submission, the termination decision was affirmed on March 21, 2005. (Compl. ¶ 32.) Plaintiff requested another review of the termination decision by the Board of Trustees. (Compl. ¶ 34.)

Plaintiff's complaints regarding the "due process" afforded her by ASU are that: (1) the hearing officer's report did not include "independent findings of fact" (Compl. ¶ 29); (2) the hearing officer did not recommend her termination soon enough (Compl. ¶ 29); and (3) the Board of Trustees did not act, or did not act in a timely manner, on her appeal (Compl. ¶¶ 33-34).

The ASU Non-Academic Employee Handbook ("the Handbook"), a copy of which is attached hereto,[1] expressly reserves to ASU the "exclusive discretion" to dismiss employees "without prior employee consultation." Handbook, attached hereto as Exhibit A, at Section V, Page 18. Similarly, employees are allowed to resign at any time subject only to potential consideration of any failure to provide one pay period of notice if they later reapply with ASU. Handbook at Section 7.1, Page

---

[1] Plaintiff cites and relies upon the Non-Academic Staff Handbook throughout her Complaint. It is appropriate for Defendants to attach a copy of this document which is "central" to Plaintiff's claims and its inclusion does not necessitate conversion of this Motion to a motion for summary judgment. *See Horsley v. Feldt,* 304 F.3d 1125, 1134 (11th Cir. 2002) (holding that documents central to plaintiff's claims may be considered in ruling on motion to dismiss).

66. The Handbook lists potential disciplinary offenses and punishments but advises that the list is "a guide" that "does not necessarily include all forms of employee misconduct that may occur." Handbook at Section 6.1, Page 50.

With regard to the provisions specifically raised by Plaintiff in her Complaint, the Handbook does not read precisely as Plaintiff alleges. The Handbook does not require the hearing officer to make "independent factual findings" enumerated individually as Plaintiff alleges; rather, the Handbook only requires that there be some "factual findings" by the hearing officer. Handbook, Section 6.3.1(F)(9), Page 58. There is no dispute that the hearing officer's opinion agreed with and adopted the factual findings of Dr. Frazier. (Compl. ¶ 29.) Nor does the Handbook absolutely guarantee consideration of an appeal to the Board of Trustees as Plaintiff implies. The Handbook states that the Board of Trustees "shall not consider the appeal unless the action proposed by the President does not comply with University policy and/or is not supported by the record made before the hearing officer." Handbook Section 6.3.2, Page 60.[2]

---

[2] Plaintiff also alleges that the Report was untimely although the Report was provided within thirty working days of the hearing (forty-one calendar days). In any event, Plaintiff has failed to demonstrate how a delay in a decision recommending termination could form the basis for any actionable claim under either state or federal law.

## PLAINTIFF'S CLAIMS AND DEFENDANTS' DEFENSES

Plaintiff asserts six counts in her Complaint. In Count One, Plaintiff asserts a state law breach of contract claim against ASU, President Lee, Mr. Parker and Dr. Frazier based on alleged violations of the disciplinary and termination procedures in the Non-Academic Staff Handbook provided to Plaintiff. (Compl. ¶¶ 42-45.) Plaintiff does not specify whether the contract claims against President Lee are in his individual or official capacity. In Count Two, Plaintiff alleges that Defendants President Lee, Dr. Frazier and Mr. Parker "conspired to cover up the financial mismanagement as to the Acadome." (Compl. ¶ 47.) Plaintiff asserts a claim under 42 U.S.C. § 1983 for a violation of unidentified "rights" and for a conspiracy to violate unidentified rights under 42 U.S.C. § 1985. (Compl. ¶ 47.) In Count Three, Plaintiff asserts a state law conspiracy claim against Mr. Parker, Dr. Frazier, and President Lee for conspiring to "wrongfully breach Foster's contract of employment in retaliation for her activities related to whistle blowing on Defendant Parker's theft of University funds." (Compl. ¶ 50.) In Count Four, Plaintiff asserts a claim under 42 U.S.C. § 1983 for denial of due process. (Compl. ¶ 54.) Specifically, Plaintiff alleges that the Handbook provides "procedures for disciplinary action" that were not adhered to by Defendants. (Compl. ¶ 55.) Plaintiff does not allege, however, a property right to her job based on Alabama law or that she was denied an opportunity

to present her version of events to a neutral party before her employment was terminated.  In Count Five, Plaintiff claims that President Lee and Dr. Frazier failed to properly train and supervise Mr. Parker and promulgated policies that led to "no fiscal accountability" at the ASU Acadome.  In Count Six, Plaintiff claims that she was treated differently than Defendant Parker and other male employees in violation of the Equal Protection Clause.

In their Answer, ASU and President Lee have timely asserted defenses of sovereign immunity, qualified immunity, and discretionary function immunity, as appropriate.  (Answer, Affirmative Defenses 2, 3, 4, and 5.)  ASU and President Lee have timely asserted a statute of limitations defense.  (Answer, Affirmative Defense 6.)  Additionally, ASU and President Lee have asserted that Plaintiff has failed to allege facts demonstrating a claim for breach of contract or actionable claims under 42 U.S.C. §1983 and §1985.  (Answer, Affirmative Defenses 12 and 14.)

## STANDARD OF REVIEW

Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *Mergens v. Dreyfoos,* 166 F.3d 1114, 1117 (11th Cir. 1999).  In ruling on a motion under Rule 12(c), the Court accepts the facts alleged in the complaint as true and view them in the light most favorable to the nonmoving party. *Id.*  Qualified immunity is a

6

question of law that is properly asserted as a request for judgment on the pleadings

pursuant to Rule 12(c).  *Ansley v. Heinrich,* 925 F.2d 1339, 1341 (11th Cir. 1991).

## ARGUMENT

**A.    All of Plaintiff's claims against ASU are barred by Eleventh Amendment immunity.**

Eleventh amendment sovereign immunity has been held to apply to suits

brought by citizens against their own state.  *See Idaho v. Coeur d'Alene Tribe,* 521

U.S. 261, 269 (1997); *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779

(1991).  Here, it is undisputed that ASU is an instrumentality of the state that is

entitled to Alabama's sovereign immunity.  *See Harden v. Adams,* 760 F.2d 1158,

1163-64 (11th Cir. 1985) (holding that state universities are agencies or

instrumentalities of the state for purposes of eleventh amendment immunity); *Davis*

*v. Alabama State Univ.,* 613 F. Supp. 134, 139-40 (M.D. Ala. 1985) (Thompson, J.)

(holding that the eleventh amendment prohibits federal courts from entertaining suits

against ASU and its board of trustees, as well as suits for damages against the

president of ASU in his official capacity).  Thus, the Eleventh Amendment bars all

of Plaintiff's claims against ASU, regardless of the relief she seeks.  *See Pennhurst*

*State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984) ("[A] suit in which the

State or one of its agencies or departments is named as defendant is proscribed by the

Eleventh Amendment... . This jurisdictional bar applies regardless of the nature of the relief sought."). *See also Carter v. Harris*, 64 F. Supp. 2d 1182, 1186 (M.D. Ala. 1999) (dismissing all claims against ASU under § 1983 on the basis of sovereign immunity).

**B.    Eleventh Amendment immunity bars all federal claims against President Lee in his official capacity for monetary and retrospective relief and bars all of Plaintiff's state law claims against President Lee in his official capacity in their entirety.**[3]

The Eleventh Amendment precludes Plaintiff from obtaining monetary damages or retrospective relief from President Lee, or any of the other individual defendants in their official capacities, for her federal claims. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985) ("[T]he Eleventh Amendment bars a damages action against a State in federal court... . This bar remains in effect when State officials are sued for damages in their official capacity."). Additionally, while the Eleventh Amendment allows a federal suit against a state official in his official capacity for certain forms of prospective equitable relief to rectify violations of *federal* law, there is not a similar exception when the state official is sued in federal court for violations of *state* law. In the latter situation, the official's immunity

---

[3] Only Plaintiff's claim for reinstatement qualifies as prospective injunctive relief. *See Cross v. Ala.,* 49 F.3d 1490 (11th Cir. 1995) (prospective relief of reinstatement not barred by Eleventh Amendment).

pursuant to the Eleventh Amendment is absolute. *Pennhurst,* 465 U.S. at 104-06.

Accordingly, Plaintiff's state law claims against President Lee in his official capacity

are due to be dismissed.

**C.    All of Plaintiff's federal claims against President Lee in his individual
       capacity are barred by the doctrine of qualified immunity.**

Under the doctrine of qualified immunity, government officials performing

discretionary functions[4] may not be held individually liable for civil damages so long

as their conduct does not violate "'clearly established statutory or constitutional rights

of which a reasonable person would have known.'" *Lassiter v. Alabama A&M Univ.,*

28 F.3d 1146, 1149 (11th Cir. 1994) (en banc).  In determining whether this standard

has been satisfied, the Court should first address whether, in the light most favorable

to Plaintiff, the record shows that President Lee violated Plaintiff's federal rights. *See*

---

[4]  The first prong of qualified immunity analysis requires the Court to analyze whether President Lee was acting within the scope of his discretionary authority.  This "low hurdle" is frequently skipped over in analysis.  *See, e.g., Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir. 1994) (skipping over issue of discretionary function to discuss clearly established law); *Godby v. Montgomery County Bd. of Educ.,* 996 F. Supp. 1390, 1400 -1401 (M.D. Ala. 1998) (describing the first step of analysis as "quite a low hurdle to clear").  An official may show that an act was within his discretionary authority merely by showing that the acts "(1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.'" *Jordan v. Doe,* 38 F.3d 1559, 1566 (11th Cir.1994) (finding that transporting prisoners and contracting with jails were part of discretionary duties of U.S. Marshals).  As all the allegations against President Lee are based on his position with ASU and his supposed supervisory responsibilities by virtue of his position with ASU, there can be no dispute that President Lee was executing his discretionary responsibilities such that he would be entitled to assert the qualified immunity defense.  *See generally Green v. County School Board of New Kent Co.,* 391 U.S. 430, 435 (1968) (listing "facets of school operation" as "faculty, staff, transportation, extracurricular activities," and student composition.).

*Saucier v. Katz,* 533 U.S. 194, 201 (2001).  If the facts as alleged demonstrate that such a violation occurred, the Court must then determine "whether the right was clearly established" at the pertinent time by the pre-existing law.  *Id.*

1.    *Plaintiff's allegations do not establish a violation of a constitutional right by President Lee.*

In Count Two, Plaintiff alleges that President Lee, Dr. Frazier and Mr. Parker conspired to "cover up financial mismanagement as to the Acadome."  Plaintiff claims that President Lee was aware of the inappropriate expenditure of Acadome funds by Mr. Parker and failed to "protect Foster with knowledge of her complaints about Parker."  Plaintiff does not reference a single constitutional amendment or identify any specific right that was violated by this conduct.  Plaintiff's vague and conclusory allegation that Defendants acted in "reckless disregard for the rights of Foster" is woefully insufficient to state a cognizable claim under 42 U.S.C. § 1983. These allegations, even if true, do not state a claim under either 42 U.S.C. § 1983 or § 1985.[5]  *GJR Investments, Inc. v. County of Escambia, Fla.,* 132 F.3d 1359, 1369 (11th Cir. 1998) (explaining that "[a] district court may not infer claims other than

_____

[5] Although Plaintiff mentions "complaints" about Mr. Parker (without any factual allegation demonstrating those "complaints" were made or relayed to President Lee), Plaintiff's complaints about Mr. Parker's spending stemmed from her duties as an ASU employee charged with "monitoring the Acadome budget."  (Compl. ¶ 12), because Plaintiff cannot show the complaints were made in her capacity as a private citizen, they cannot form the basis for a speech-based claim. *See Gilder-Lucas v. Elmore County Board of Education*, 399 F. Supp. 2d 1267 (M.D. Ala. 2005) (Thompson, J.), *aff'd* 186 Fed. Appx. 885 (11th Cir. 2006).

those that plainly appear on the face of the complaint to defeat a defense of qualified immunity"); *see also Dalrymple v. Reno,* 334 F.3d 991, 996 (11th Cir. 2003) (in civil rights cases involving defense of qualified immunity, a complaint will be dismissed as insufficient where its allegations are vague and conclusory*); McDaniel v. Woodard*, 886 F.2d 311, 314 (11th Cir. 1989) ("For purposes of qualified immunity, the Plaintiff must do more than simply make general, conclusory allegations of some constitutional violation or state broad legal truisms, generalities are just not helpful."). For this reason alone, Count Two of Plaintiff's Complaint is due to be dismissed.

In Count Four, Plaintiff alleges that she was denied due process with regard to her termination. Plaintiff bases her due process claim upon President Lee's supposed failure to comply with handbook procedures for post-termination appeals. Notably, Plaintiff has not alleged that she, as a staff employee who was neither a tenured teacher nor merit system employee under Alabama law, had a cognizable property interest in her position. Read in its entirety, the Handbook clearly reserves to ASU the "exclusive discretion" to dismiss an employee "without consultation." Handbook at Section V, Page 18. This express reservation should preclude Plaintiff from claiming a property interest created by the Handbook. *Boyett v. Troy State University at Montgomery,* 971 F. Supp. 1403, 1411 -1413 (M.D. Ala. 1997) (Albritton, J.)

(concluding employee handbook that provides list of reasons for dismissal that is not all-inclusive, reserves right to terminate for nonspecified reasons, and reserves mutual privilege of terminating employment relationship at any time does not evidence intent to create constitutionally protectable property interest in continued employment). While the Handbook may set out procedures for discipline and appeals, "a promised procedure cannot, by itself, confer a property right." *Boyett*, 971 F. Supp. at 1413. Indeed, this Court has recognized this well-settled principle of law and dismissed a procedural due process claim based on alleged violations of handbook procedures. *Shuford v. Alabama State Bd. of Educ.,* 978 F. Supp. 1008, 1023 -1024 (M.D. Ala. 1997) (Thompson, J.) (dismissing due process claim based on failure to comply with pre-termination notice provisions of an employee handbook for lack of a cognizable property interest). Accordingly, because there is no property interest upon which to base a claim for due process, Count Four of Plaintiff's Complaint is due to be dismissed.

Additionally, even assuming Plaintiff had a cognizable property interest, her allegations of Handbook violations, even if true, do not allege a violation of constitutional due process. Due process requires "notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 303, 313 (1950). In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532

12

(1985), the United States Supreme Court explained that pursuant to constitutional due process protections an employee with a property interest is entitled "to oral or written notice of the charges against him, an explanation of the employer's evidence and an opportunity to present his side of the story." *Id.* at 546. Plaintiff's own allegations establish that she received all the due process the Constitution requires: Plaintiff received advance notice of the charges against her, a hearing, and the opportunity to present evidence to a neutral third party, all in advance of the hearing officer's termination recommendation and the adoption of that recommendation by President Lee. (Compl. ¶ 27-29.) As this Court has recognized, only the Constitution – not the ASU Handbook – determines "what process is due" under the Constitution. *See Davis v. Alabama State Univerisity*, 613 F. Supp. 134, 138-139 (M.D. Ala. 1985) (Thompson, J.) (dismissing procedural due process claim based on failure to present appeal to Board of Trustees in accordance with ASU's employee handbook). The Constitution does not require specifically enumerated written factual findings by the hearing officer, a determination on termination within thirty days, or an appeal to the Board of Trustees. *See id.* Accordingly, Plaintiff cannot maintain a due process claim based on such violations.

Count Five asserts a failure to train claim against President Lee based on his supposed failure to ensure fiscal accountability at the ASU Acadome. There is no

constitutional amendment guaranteeing Plaintiff the right to fiscal accountability with regard to the ASU Academe. Plaintiff does not allege how these failures connect to the alleged constitutional violation about which Plaintiff complains, namely, conduct by Mr. Parker purportedly causing Plaintiff's termination. For a supervisor "to be liable under § 1983, [his or] her liability must be based on something more than the theory of respondeat superior." *Braddy v. Florida Dep't of Labor and Employment Security,* 133 F.3d 797, 801 (11th Cir.1998). Under § 1983, supervisory official liability

> "occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."

*Cross v. State of Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995)(quoting *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990)). In this case, Plaintiff does not allege that President Lee personally participated in the alleged misconduct of Mr. Parker. Nor does she allege that there was a pattern of widespread constitutional deprivations of the kind about which she complains that would be sufficient to put President Lee on notice of the need for more supervision or training of Mr. Parker. Plaintiff's allegations that President Lee knew of mismanagement of Academe funds does not

14

mean that President Lee knew of widespread constitutional violations that needed to be corrected. Accordingly, because Plaintiff has not alleged a constitutional violation attributable to President Lee, Count Five is due to be dismissed. *See Greason v. Kemp,* 891 F.2d 829, 836-37 (11th Cir. 1990) (holding a supervisor sued in his or her individual capacity is entitled to qualified immunity unless a reasonable supervisor would have known that his or her actions were unlawful in light of clearly-established law and the information possessed by him).

In Count Six, Plaintiff asserts a claim under the Equal Protection Clause. Plaintiff's allegations do not state a claim under the Equal Protection Clause because she does not allege that President Lee intentionally discriminated against her on the basis of her gender. *Baker v. Hicks*, No. 2:07CV256-WHA, 2007 WL 1625448 (M.D. Ala. June 5, 2007) (Albritton, J.) ("Evidence which merely indicates disparity of treatment or erroneous or even arbitrary administration of state powers rather than instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent.") Indeed, the only involvement alleged by President Lee was reviewing and affirming a termination decision that had already been made. This involvement is insufficient to establish a constitutional violation by President Lee. *See, e.g., Langley v. Adams County, Colo.* 987 F.2d 1473, 1479 (10th Cir. 1993) (affirming dismissal of claims against Broderson and noting there "is no evidence of

any involvement by Brodersen in plaintiff's discharge until plaintiff appealed Millsap's decision to him, and even then his only involvement was affirming Millsap's decision").

Not only does Count Six omit these critical facts, Plaintiff's Complaint notably does allege facts that disprove her Equal Protection Claim.  Specifically, Plaintiff alleges that: (1) the motivation of her supervisor in initiating termination was "his own financial self interest" (Compl. ¶ 55); (2) Ms. Daniels, her female coworker, engaged in similar conduct but was apparently retained (Compl. ¶ 10-13); and (3) the male employees with whom she attempts to compare herself are **not** similarly situated (Compl. ¶ 63).  Accordingly, even overlooking the obvious pleading deficiencies noted above, based on the facts Plaintiff actually alleges in her Complaint, Plaintiff cannot sustain an Equal Protection Clause claim.  *McKinney v. Orange County, Florida*, No. 6-06-CV-1240, 2007 WL 2119388, *6 (M.D .Fla. July 20, 2007) ("Bare allegations that others were treated differently do not state an equal protection claim; 'a complaint must attempt to show in some fashion that these 'other' [persons] were situated similarly to the plaintiff.'") (quoting *GJR Invs.,* 132 F.3d at 1367-68).

2.   *Even if Plaintiff had alleged a constitutional violation by President Lee, and she has not, she cannot establish that the law was clearly established as required to defeat immunity.*

Even if Plaintiff's allegations properly alleged a constitutional violation by

President Lee, and they do not, the law was not so clearly established based upon these facts as to defeat qualified immunity. Count Two alleges a claim to violate unidentified "civil rights." The only specific allegations against President Lee relate to a "conspiracy" to "cover up the financial mismanagement as to the Acadome." There is no published case speaking to the illegality of "covering up" or attempting to keep from public disclosure information about the "financial mismanagement" of the Acadome.

Similarly, even if the § 1985 conspiracy claim set out in Count Two was not barred by the intracorporate conspiracy doctrine, there is no case law recognizing a "conspiracy" for attempts to "cover up the financial mismanagement as to the Acadome." To the contrary, a "conspiracy" based on such allegations is clearly not actionable under the statute. *See Reeves v. Thigpen,* 879 F. Supp. 1153, 1179 (M.D. Ala. 1995) ("The elements of a cause of action under Section 1985(3) are (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or his property or deprived of any right or privilege of a citizen of the United States. The second of these elements requires a showing of 'some racial, or perhaps otherwise class-based, invidiously discriminatory

animus behind the conspirators' action.'") (internal citations omitted).  Accordingly, Count Two is due to be dismissed.

As to Count Four, the Handbook, at most, sets forth procedures for termination and appeals.  The existing, binding case law establishes that a property interest cannot be created by procedural protections set out in a handbook.  *Loudermill,* 470 U.S. at 541 ("'Property' cannot be defined by the procedures provided for its deprivation"); *Green v. City of Hamilton Hous. Auth.,* 937 F.2d 1561, 1565 n. 2 (11th Cir. 1991) ("It is on the substantive restrictions on the employer's discretion to discharge, rather than on the procedural protections provided, that the existence of a property interest is based.").  Additionally, as Plaintiff alleges in her Complaint, at the time President Lee became involved, she had already been apprised of the allegations against her, granted a hearing before a neutral hearing officer, and presented all the evidence that she claims supported her position.  (Compl. ¶ 27-29.)  In light of these facts, the law was not clearly established that any of the deficiencies alleged by Plaintiff concerning the writeup by the hearing officer or the appeal to the Board of Trustees amounted to a denial of due process under the Constitution.  Given that the state of the law was and remains contrary to the position espoused by Plaintiff, she cannot show that in 2005 it was clearly established that President Lee's conduct deprived her of a constitutionally recognized property interest.  Accordingly, President Lee is entitled

to qualified immunity as to Plaintiff's due process claim.

Count Five is due to be dismissed because Plaintiff cannot show the law was sufficiently clear to establish supervisor liability based on a failure to train and supervise and control in these circumstances. Plaintiff alleges that President Lee should be liable for Plaintiff's allegedly unlawful termination because he knew of financial mismanagement of the Acadome. Even assuming proper financial management of the Acadome is a right recognized by the United States Constitution, there is no causal connection between Plaintiff's allegation of President Lee's knowledge of the violation of this "constitutional right" by Mr. Parker's purported mismanagement of funds (and supposed inaction to remedy this mismanagement) and the violation about which Plaintiff's complains, namely, her termination without proper compliance with the Handbook's procedures. Plaintiff does not allege, nor can she, that President Lee had knowledge of any previous failures to comply with "due process" by Mr. Parker, much less that due process deprivations were "obvious, flagrant, rampant, and of continued duration." *Braddy,* 133 F.3d at 802. Accordingly, Plaintiff cannot overcome the defense of qualified immunity. *Id.* ("The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous. The causal connection between Lynch's offensive behavior and Davis's liability as his supervisor for such behavior can only

19

be established if the harassment was sufficiently widespread so as to put Davis on notice of the need to act and she failed to do so. A few isolated instances of harassment will not suffice, the "deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration." After careful review of the record, we conclude that while Davis's response to Braddy's complaints may not have been optimal, it was not constitutionally inadequate for purposes of qualified immunity.").

Nor can Plaintiff show that President Lee violated clearly established law under the Equal Protection Clause by approving Plaintiff's termination for falsifying time records. As Plaintiff's allegations concede, she was not in fact similarly situated to the males with whom she compares herself, (Compl. ¶ 63) (noting that male employees, unlike Plaintiff, "did not charge a male supervisor with financial misconduct"), and there is no allegation that President Lee acted based on intentional gender discrimination. There is no cognizable claim for retaliation under the Equal Protection Clause and correspondingly, no "clearly established law" from which an inference of gender based discrimination could be inferred based on Plaintiff's claims that she was terminated in retaliation for her charges of financial misconduct. *See Watkins v. Bowden,* 105 F.3d 1344, 1354-55 (11th Cir. 1997) ("A pure or generic retaliation claim, however, simply does not implicate the Equal Protection Clause.").

*See also Butler v. Alabama Dept. of Transp.*, No. 2:06-CV-278-MEF, 2007 WL 1490908, *9 (M.D. Ala. May 21, 2007) ("[T]to the extent that Plaintiff's retaliation claims are in fact brought under the Equal Protection Clause, Waits and Jackson are entitled to qualified immunity on those claims because there is no right under the Equal Protection Clause to be free from retaliation.").

**D.    Plaintiff's remaining state law claims against President Lee in his individual capacity are barred by the doctrine of discretionary function immunity.[6]**

Discretionary function immunity shields public officials from tort liability for discretionary actions within the scope of their authority. *Bell v. Chisom,* 421 So. 2d 1239, 1241 (Ala.1982). Alabama courts have also adopted the *Restatement (Second) of Torts* § 895D (3)(a) (1977) and the factors discussed therein in determining whether a public officer was performing a discretionary function. The *Restatement* suggests the following factors to consider:

> "[1] the nature and importance of the function that the officer is performing; [2] the extent to which passing judgment on the exercise of discretion will amount necessarily to passing judgment on the conduct of a coordinate branch of government; [3] the extent to which the imposition of liability would impair the free exercise of discretion by the officer; [4] the extent to which the ultimate financial responsibility will fall on the officer; [5] the likelihood that harm will result to members of the public if the action is taken; [6] the nature and seriousness of the

---

[6] As discussed in Section B, *supra*, the state law claims against President Lee in his official capacity are barred by Eleventh Amendment immunity.

> type of harm that may be produced; and [7] the availability to the injured
> party of other remedies and their forms of relief."

*Restatement (Second) of Torts* § 895D, comment f.  In this case, there can be no genuine dispute that Defendant Lee, as President of ASU, was exercising his discretion pursuant to his authority in reviewing the termination decision and monitoring ASU employees.

If the actions complained of are discretionary acts, as they are in this case, "the burden shifts to the plaintiff to demonstrate that the defendants acted in bad faith, with malice or willfulness in order to deny them immunity." *Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998).  Based on the recent United States Supreme Court decision in *Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955 (2007), Plaintiff's recitation of the term "bad faith" with no supporting factual allegations is insufficient to sustain claims against President Lee and overcome the immunity defense.  127 S.Ct. at 1965 ( explaining that a "formulaic recitation of the elements of a cause of action will not do .... Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests").  Accordingly, because Plaintiff has not alleged any facts evidencing malice or bad faith on the part of President Lee, her claims are preempted by the doctrine of discretionary function immunity.

22

**E.    Even if claims against President Lee are not dismissed on immunity grounds, Plaintiff's remaining claims fail as a matter of law.**

All of Plaintiff's claims against President Lee are due to be dismissed on immunity grounds; however, to the extent the claims are not dismissed based on immunity grounds, judgment on the pleadings should nonetheless be granted because Plaintiff's allegations fail as a matter of law.  First, as to Count One, Plaintiff alleges that she had a contract with ASU, not with President Lee in his individual capacity. (Compl. ¶ 42).  President Lee cannot be individually liable for a contract to which he was not a party.  The conspiracy claims in Counts Two and Three are barred by the intracorporate conspiracy doctrine because all the alleged "conspirators" are employees of ASU.  *See McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1035 (11th Cir. 2000) (en banc) ("The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."). Additionally, as set forth above, Count Two does not reference a specific constitutional right actionable under 42 U.S.C. § 1983 and the facts alleged do not support a claim of a constitutional violation.  *See, e.g., Phillips v. City of Dawsonville*, No. 06-16031, 2007 WL 2593535 (11th Cir. Sept. 11, 2007) (affirming

23

dismissal, without discussing qualified immunity issues, because former city clerk's claim that she was terminated due to complaints about mayor's personal misconduct and financial mismanagement was not an actionable First Amendment claim).

As to Counts Four and Five, Plaintiff's claims fail as a matter of law because there are no factual allegations demonstrating a constitutionally recognized property interest, no facts evidencing an actionable denial of due process as opposed to alleged violations of handbook procedures, and no allegations demonstrating widespread due process violations sufficient to impose supervisor liability on President Lee under 42 U.S.C. § 1983.

Count Six fails because the factual allegations of Plaintiff's Complaint clearly establish that Plaintiff is not similarly situated to the unidentified male employees with whom she compares herself. (Compl. ¶ 63.) Count Six is nothing more than an impermissible attempt to bootstrap a retaliation claim not cognizable under the First Amendment, *supra* note 4, to the Equal Protection Clause. A claim for retaliation under the Equal Protection Clause is not cognizable under the law. *See Watkins v. Bowden*, 105 F.3d 1344, 1354-55 (11th Cir. 1997) (noting the law is well established that retaliation claims are not actionable under the Equal Protection Clause).[7]

---

[7] Additionally, all of Plaintiff's claims stem from her termination and from the face of the Complaint, appear to be barred by the statute of limitations. In her Complaint, Plaintiff alleges that she learned of her termination after February 23, 2005 but no later than March 11, 2005 as she had already prepared an appeal by March 11, 2005. (Compl. ¶¶ 29-30.) The statute of limitations for

# CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendants Alabama State University and Dr. Joseph Lee respectfully request that this Court dismiss all of Plaintiff's claims against these Defendants with prejudice.

---

claims under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 is two years. *Poelinitz v. Bondurant Lumber, Inc.*, No. 06-0506, 2007 WL 2570751, *3 (S.D. Ala. Aug. 30, 2007) ("In Alabama, the statute of limitations for § 1983 action is two years."); *Trawinski v. United Technologies*, 313 F.3d 1295, 1298 (11th Cir. 2002) (two year statute of limitations under Alabama law for conspiracy claims under § 1985). The United States Supreme Court has held that in the case of a termination, the statute of limitations begins to run when the employee is apprised of the termination decision not when employment ends. *See Chardon v. Fernandez,* 454 U.S. 6, 7-8 (1981). Similarly, the Eleventh Circuit Court of Appeals has held that notice of an adverse decision communicated to the employee is sufficient to start the statute of limitations. *See Nance v. Maxwell Federal Credit Union,* 186 F.3d 1338, 1341 (11th Cir. 1999) (holding employer's notice to employee that she would be required to resign or accept a demotion was actionable and began statute of limitations even though decision was later reversed before plaintiff was actually required to accept a promotion or resign). The fact Plaintiff alleges she was pursuing administrative remedies is insufficient to toll the statute of limitations. *See Smith v. McClammy,* 740 F.2d 925, 927 (11th Cir. 1984) ("As to the § 1983 claim, Smith argues that the statute of limitations did not begin to run until she had exhausted state administrative remedies through the Alabama Education Association. An individual is not required to exhaust administrative remedies prior to instituting an action under § 1983. Since exhaustion of administrative remedies is not a prerequisite to filing suit, the statute would not be tolled pending pursuit of administrative remedies but would begin to run on the date the cause of action accrued.") (internal citations omitted). Accordingly, as Plaintiff's Complaint was filed on March 20, 2007, more than two years after she was informed of the termination decision, her claims under 42 U.S.C. § 1983 and § 1985 are barred by the statute of limitations. Plaintiff's state law conspiracy claim based upon the conspiracy to breach her employment contract, which is based on the same facts, would likewise be barred by Alabama's two year statute of limitations for conspiracy claims. *Travis v. Ziter*, 681 So. 2d 1348, 1350 n. 1 (Ala.1996).

Respectfully submitted,

   /s/Kimberly W. Geisler
Carter H. Dukes
Kimberly W. Geisler
Attorneys for Defendants
Alabama State University
and Dr. Joe A. Lee

**OF COUNSEL**:
SCOTT DUKES & GEISLER, P.C.
2100 Third Avenue North, Suite 700
Birmingham, Alabama 35203
Telephone: (205) 251-2300
Facsimile: (205) 251-6773

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and will serve the foregoing via the CM/ECF or U.S. Mail on the following:

Donald Rush Jones, Jr.
2000 Interstate Park Drive
Suite 104
Montgomery, Alabama 36109

Thomas C. Tankersley
Thomas C. Tankersley PC
Post Office Box 11386
Montgomery, Alabama 36111

James Harold Anderson
Beers Anderson Jackson Patty & Van Heest PC
Post Office Box 1988
Montgomery, Alabama 36102-1988

Solomon S. Seay, Jr.
Solomon S. Seay, Jr., P.C.
Post Office Box 210998
Montgomery, Alabama 36121

C. Clay Torbert, III, Esq.
Capell & Howard P.C.
150 South Perry Street
Post Office Box 2069
Montgomery, Alabama 36102

Richard E. Broughton, Esq.
Ball Ball Mathews
2000 Interstate Park Drive
Suite 204
Montgomery, Alabama 36109

Ramadanah M. Salaam-Jones, Esq.
Thomas, Means, Gillis & Seay, P.C.
3121 Zelda Court
Montgomery, Alabama 36103

DONE this the 17th day of September, 2007.

/s/Kimberly W. Geisler
Of Counsel

Case 2:24-cv-01321-RAH-SMD    Document 1-2    Filed 03/13/2024    Page 1 of 85

# NON ACADEMIC STAFF
# HANDBOOK



# TABLE OF CONTENTS

FOREWORD ............................................................................................

ALABAMA STATE UNIVERSITY MISSION ..........................................

ALABAMA STATE UNIVERSITY HISTORICAL SKETCH ....................

STRUCTURE AND FUNCTIONS OF THE BOARD OF TRUSTEES ..........

ADMINISTRATIVE ORGANIZATION OF THE UNIVERSITY ...............

DUTIES AND RESPONSIBILITIES OF THE PRESIDENT
AND OF SENIOR OFFICERS REPORTING TO THE PRESIDENT ...........

WELCOME ..............................................................................................

INTRODUCTION .............................................................................. 1

I.      PURPOSE AND USE OF THE HANDBOOK ................................ 1
II.     DEFINITIONS .............................................................................. 1
III.    SCOPE AND ORGANIZATION ..................................................... 1
IV.     RESPONSIBILITY OF THE OFFICE OF PERSONNEL
        SERVICES AND HUMAN RELATIONS .......................................... 1
V.      RIGHTS OF THE UNIVERSITY ................................................... 1
VI.     APPLICABLE LAWS AND REGULATIONS .................................. 1

1.0.    CLASSIFICATION OF POSITIONS AND EMPLOYEE SERVICE STATUS ... 2
        1.1     CLASSIFICATION OF POSITIONS ...................................... 2
        1.2     EMPLOYEE SERVICE STATUS ........................................... 2

2.0     EMPLOYMENT POLICIES ...................................................... 2
        2.1     EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION ........... 2
        2.2     EMPLOYMENT ELIGIBILITY GUIDELINES .......................... 2
                2.2.1   MINIMUM JOB REQUIREMENTS ............................ 2
                2.2.2   AGE REQUIREMENTS ........................................... 2
                2.2.3   EMPLOYMENT OF RELATIVES .............................. 2
                2.2.4   ALIENS ............................................................... 2
                2.2.5   EMPLOYMENT OF ATHLETIC COACH ..................... 2
                2.2.6   REEMPLOYMENT OF FORMER EMPLOYEES ........... 2
        2.3     RECRUITMENT, SCREENING AND APPOINTMENT ............. 2
        2.4     INITIAL BRIEFING AND GENERAL ORIENTATION
                FOR NEW EMPLOYEES ...................................................... 2
        2.5     PROBATIONARY EMPLOYMENT PERIOD ........................... 2
        2.6     RIGHT TO PERMANENT EMPLOYMENT STATUS ............... 2
        2.7     EMPLOYEE SERVICE STATUS OF LABORATORY
                STAFF PERSONNEL ........................................................... 2

2.8     OTHER CHANGES IN EMPLOYMENT STATUS ........................ 2
        2.8.1   LATERAL TRANSFER ................................................. 2
        2.8.2   DEMOTION ............................................................... 2
2.9     DUAL EMPLOYMENT ........................................................... 2
2.10    OUTSIDE EMPLOYMENT ...................................................... 2
2.11    SERVICE PERIODS ................................................................. 3
2.12    PERSONNEL RECORDS .......................................................... 3
        2.12.1  MAINTAINING OFFICIAL PERSONNEL FILES ........... 3
        2.12.2  ACCESS TO PERSONNEL FILES ............................... 3
        2.12.3  REPORTING CHANGES IN THE PERSONNEL RECORD ....... 3

3.0     EMPLOYEE ATTENDANCE AND LEAVE BENEFITS ................... 3
3.1     WORK SCHEDULES ............................................................... 3
        3.1.1   NORMAL AND SPECIAL WORK SCHEDULES ............ 3
        3.1.2   BREAKS OR REST PERIODS .................................... 3
        3.1.3   OVERTIME WORK ASSIGNMENTS .......................... 3
        3.1.4   COMPENSATORY TIME OFF ................................... 3
        3.1.5   ACCOMMODATING THE WORK SCHEDULE
                FOR RELIGIOUS OBSERVANCES ............................ 3
        3.1.6   EMERGENCY CLOSINGS AND CALL BACKS ............ 3
3.2     ATTENDANCE, TIME CARDS AND TIMEKEEPING ................... 34
3.3     HOLIDAYS .............................................................................. 35
3.4     ANNUAL LEAVE ..................................................................... 36
3.5     SICK LEAVE ........................................................................... 37
3.6     UNPAID LEAVE OF ABSENCE FOR MEDICAL REASONS .......... 39
3.7     UNPAID LEAVE OF ABSENCE FOR PERSONAL
        OR PROFESSIONAL REASONS ................................................ 40
3.8     MATERNITY AND PARENTAL CARE LEAVE .......................... 40
3.9     BEREAVEMENT LEAVE .......................................................... 41
3.10    MILITARY LEAVE ................................................................... 41
3.11    CIVIC LEAVE .......................................................................... 41
        3.11.1  LEAVE FOR VOTING ............................................. 41
        3.11.2  JURY DUTY LEAVE ............................................... 42

4.0     EMPLOYEE STANDARDS AND PRACTICES ............................ 43
4.1     SAFETY ................................................................................... 43
4.2     INJURY IN THE WORK PLACE ................................................ 43
4.3     DRESS CODE ........................................................................... 44

| | | | |
|---|---|---|---|
| 4.4 | TELEPHONE CALLS | | 4 |
| 4.5 | SMOKING | | 4 |
| 4.6 | USE OF BULLETIN BOARDS | | 4 |
| 4.7 | PROTECTING CONFIDENTIAL INFORMATION | | 4 |
| 4.8 | GIFTS | | 4 |
| 4.9 | PERSONAL AND INTEROFFICE VISITATION | | 4 |
| 4.10 | POLITICAL ACTIVITY | | 4 |
| 4.11 | CONFLICT OF INTEREST | | 4 |
| 4.12 | USE OF UNIVERSITY NAME | | 4 |
| 4.13 | SOLICITATIONS | | 4 |
| 5.0 | PERFORMANCE EVALUATION | | 4 |
| 5.1 | EVALUATION REVIEW | | 4 |
| | 5.1.1 | EVALUATION PROCEDURES AND TIMING | 4 |
| | 5.1.2 | EVALUATION RATING FACTORS | 4 |
| 5.2 | PERFORMANCE EVALUATION REVIEW BOARD | | 49 |
| 6.0 | DISCIPLINARY ACTIONS AND GRIEVANCE/APPEALS PROCEDURE | | 50 |
| 6.1 | DISCIPLINARY GUIDELINES | | 50 |
| | 6.1.1 | VERBAL WARNING | 53 |
| | 6.1.2 | REPRIMAND | 53 |
| | 6.1.3 | TEN-DAY SUSPENSION WITHOUT PAY | 53 |
| | 6.1.4 | SUSPENSION WITH PAY | 54 |
| 6.2 | TERMINATION FOR DISCIPLINARY REASONS | | 54 |
| 6.3 | CANCELLATION OF CONTRACT | | 55 |
| | 6.3.1 | CANCELLATION OF CONTRACT FOR CAUSE | 55 |
| | 6.3.2 | APPEALS TO THE BOARD OF TRUSTEES | 59 |
| | 6.3.3 | CANCELLATION OF CONTRACT FOR MEDICAL DISABILITY | 60 |
| 6.4 | GRIEVANCE | | 61 |
| | 6.4.1 | GRIEVANCE PROCEDURE | 61 |
| 6.5 | POLICIES RELATING TO SEXUAL HARASSMENT | | 62 |
| | 6.5.1 | SEXUAL HARASSMENT DEFINED | 62 |
| | 6.5.2 | REPORTING INCIDENTS OF SEXUAL HARASSMENT | 63 |
| | 6.5.3 | INVESTIGATING REPORTED INCIDENTS OF SEXUAL HARASSMENT | 63 |

6.6    POLICY TO MAINTAIN A DRUG-FREE AND
       ALCOHOL-FREE WORKPLACE ............................................................ 64

6.7    DISCIPLINARY ACTION IN RESPONSE TO
       UNAUTHORIZED ABSENCES ............................................................ 65

6.8    GARNISHMENT OF EMPLOYEE WAGES ........................................ 65

7.0    TERMINATION OF EMPLOYMENT FOR
       NON-DISCIPLINARY REASONS .......................................................... 66

7.1    RESIGNATION .................................................................................... 66

7.2    RETIREMENT ...................................................................................... 66

7.3    NON-REAPPOINTMENT OF EXECUTIVE
       STATUS EMPLOYEES ........................................................................ 66

7.4    LAYOFFS DUE TO FINANCIAL EXIGENCY ................................ 67

7.5    LAYOFFS DUE TO DISCONTINUANCE OR
       CURTAILMENT OF A DEPARTMENT,
       PROGRAM OR POSITION ................................................................ 68

8.0    JOB CLASSIFICATION, SALARY SCHEDULE
       AND PAYROLL POLICIES .................................................................. 71

8.1    JOB CLASSIFICATION FOR SALARY PURPOSES ...................... 71

8.2    SALARY SCHEDULE ........................................................................ 71

8.3    PAYROLL POLICIES AND PROCEDURES ................................ 72

9.0    OTHER EMPLOYEE BENEFITS AND SERVICES ...................... 75

9.1    GROUP MEDICAL AND DENTAL INSURANCE ........................ 75

9.2    GROUP LIFE INSURANCE ............................................................ 75

9.3    RETIREMENT PROGRAM ............................................................ 76

9.4    SOCIAL SECURITY BENEFITS .................................................... 77

9.5    UNEMPLOYMENT COMPENSATION ........................................ 77

9.6    ENROLLMENT IN UNIVERSITY COURSES .............................. 77

9.7    USE OF CAMPUS FACILITIES AND SERVICES ...................... 77

9.8    POLICE AND CAMPUS SECURITY ............................................ 78

9.9    LIBRARY SERVICES ........................................................................ 78

9.10   PARKING AREAS .............................................................................. 78

9.11   COMPLIMENTARY TICKETS ........................................................ 79

9.12   EMPLOYEE IDENTIFICATION CARDS ...................................... 79

# FOREWORD

All policies in this <u>NONACADEMIC STAFF HANDBOOK</u> become effecti
October 1, 1991, all previously enacted University policies in conflict with any p
tion of the contents of this Handbook are hereby expressly repealed.

Any policies issued by any individuals or agency in conflict with these polici
are null and void.

# WELCOME

On behalf of the Board of Trustees of Alabama State University, Officials of the University, Faculty, Staff, and Student Body, I wish to welcome you to this community as a vital organ of the supportive service in advancing and projecting this University into and through its second century of marvelous leadership.

Your dedication, cooperation and attitude toward your duties and the manner in which you represent this institution to the public will be vital to its continued survival.

Alabama State University seeks to maintain an environment which ensures full utilization of the individual employee's effort, achievement, and cooperation and which also ensures adequate reward for its employees.

Every Alabama State University employee has a part in the educational effort of the University which can best be carried out only under a program of harmonious employee-employer relationships. The University strives to have happy, industrious employees who will give courteous and efficient service to all who have contact with the University through them.

You are encouraged to become thoroughly familiar with your job, perform it to the best of your ability, become familiar with employment practices, services, facilities, benefits and privileges, and to make your contribution to society through Alabama State University. In return, you will have a community with harmonious employee-employer relationships.

C. C. Baker, Interim President
Alabama State University

# ALABAMA STATE UNIVERSITY MISSION

Alabama State University is a publicly supported, coeducational institutio
a statewide mission. Its major commitments are quality programs of under
ate and graduate instruction, residential life, continuing education, public s
and research provided at the most reasonable cost to individual students a
payers.

The University's programs are particularly responsive to the needs of in
al citizens, public groups and agencies in the Montgomery community.

The University aims to develop and pursue these programs with an ope
policy to ensure that any student who desires to develop and expand hi
scholastic skills for personal, occupational or professional growth has the op
nity to do so, regardless of socio-economic status. Respect for the intell
potential and dignity of students as individual human beings without rega
racial, ethnic or cultural background, shall be paramount.

3

# ALABAMA STATE UNIVERSITY
# HISTORICAL SKETCH

Alabama State University's rich heritage of service to the people of Montgomery, the state of Alabama and indeed the nation began in Marion, Alabama, in 1866 as the Lincoln Normal School, a private institution. Historically, this was three years after Lincoln issued the Emancipation Proclamation and eight years after 4 million slaves were freed penniless. It had as its aim "the Higher Education of the Colored Race." In 1871 Peyton Finley introduced a bill in the Legislature to establish a university for "colored people." However, the bill failed and only $1,250 was appropriated for support of Lincoln Normal. In 1874, Lincoln Normal became the first state-supported, historically black institution and was for many years the only school of its kind in the Southern states.

Credited with founding the University is William Burns Paterson. Paterson led the school for 37 years and kept the school alive despite almost insurmountable odds. It was during his administration that the first class of six was graduated from the Normal Department. It was also under his leadership that the school was relocated to Montgomery.

John William Beverly, the first black teacher at State Normal, became president upon the death of Paterson. George Washington Trenholm succeeded Beverly and served from 1921 to 1925. Trenholm's son, Harper Council Trenholm, succeeded as president upon the death of the elder Trenholm. The younger Trenholm served until 1962, having seen the institution elevated to a four-year teachers college in 1928 and awarding the first bachelor's degree in 1931. H. Council Trenholm was a nationally recognized leader in academics and curriculum development.

Robert C. Hatch served for nine months as interim president. It was in the fall of 1962 that Levi Watkins was named president, a position he held until mandatory retirement in 1981.

During Watkins' administration, the college was elevated to university status, received accreditation by the Southern Association of Colleges and Schools, obtained approval for its own board of trustees, and experienced unprecedented growth with 16 new structures constructed.

Robert L. Randolph served as president from 1981 to 1983.

Leon Howard, an alumnus, served as interim president from November 1983 to August 1984. He served as president until May 31, 1991. During Howard's

administration, the University enjoyed substantial gains in student enrollmer retention, implemented the Quality Assurance Program and establishe Instructional Resource Center. Further, two new dormitories were complete ground was broken for a new health and physical education complex.

Currently, C. C. Baker, an alumnus, serves as interim president.

Today, ASU enrolls more than 4,500 students in its seven major i University College, the College of Arts and Sciences, the College of Bus Administration, the College of Education, the School of Music, the Sch Graduate Studies and Continuing Education and the Division of Aerospace St The academic offerings range from the two-year associate degree prog through programs for the bachelor and master's degrees up to programs fo education specialist degree. The physical plant is approximately 105 acres a valued at more than $60 million.

# STRUCTURE AND FUNCTIONS OF
# THE BOARD OF TRUSTEES

Alabama State University is under the management, control and mainten of a Board of Trustees. The Board of Trustees consists of one member from of the seven congressional districts in the state, except that two are named ii congressional district in which the University is located, four members fron state-at-large and the Governor, who is ex-officio President of the Board. trustees are appointed to twelve-year staggered terms by the Governor, witl advice and consent of the Senate.

The Board of Trustees by statute meets on the first Thursday in May November. It may also meet at other times on call of the Governor. Whei Board of Trustees is not in session, its business is transacted by the Exec Committee of the Board of Trustees. The officers of the Board of Trustees an Governor, who is ex-officio President of the Board; the Chairman; the Chairman; and the Secretary who serves ex-officio and is President of University. Although the Board of Trustees holds all legal power, it commit administration of the University to the President of the University and his/her administrative officers.

5



Revised 9/28/89

6

# ADMINISTRATIVE ORGANIZATION
# OF THE UNIVERSITY

The administrative organization of Alabama State University is establish the President of the University subject to final approval by the Board of Tru Detailed tables illustrating the current organization of the University are inclu an appendix to this Handbook. Currently, the President administers the Univ through four administrative divisions, each headed by a vice president, and the two additional departments, each headed by a director. The four administrativ sions are the Division of Academic Affairs, the Division of Student Affair Division of Fiscal Affairs and the Division of Administrative Service: Advancement, The two additional departments are the Office of Communic: and Public Affairs and the Department of Intercollegiate Athletics.

The Vice President for Academic Affairs directly supervises the academic gram which is administered partly through the Dean of each of the five colleg schools of the University, and which are University College, the College of Art Sciences, the College of Business Administration, the College of Education an School of Music. Also reporting to the Vice President for Academic Affair supervising specialized parts of the academic and academic support progran the Dean of Graduate Studies and Continuing Education, the Chairperson of Division of Aerospace Studies and the Director of Library and Learning Resou The Assistant Vice President for Academic Affairs directly supervises other aca ic support units, which are the Office of Enrollment Management, the Offi Records and Registration and the Instructional Resource Center.

The Vice President for Student Affairs directly supervises the Offi Counseling and Student Development, the Office of Career Planning-Place: and Cooperative Education, the Office of Student Housing Services, the Unive Center, the Health Services Unit and the University Police and Campus Sec Unit. The Assistant Vice President for Student Affairs directly supervise: Office of Residential Life and the Office of Student Activities.

The Vice President for Fiscal Affairs directly supervises the Controller, oversees all aspects of the University's programs relating to payroll, stu accounts, accounts payable, accounting services and cash management. The President for Fiscal Affairs also directly supervises the Office of Student Fina Aid, the Purchasing Department and the Office of Auxiliary Enterprises.

The Vice President for Administrative Services and Advancement din supervises the Office of Computing and Information Services, the Offic Personnel Services and Human Relations, the Office of Development and Titl

7

Programs, the Office of Alumni Relations and Development Services, the Department of Physical Plant and the Central Switchboard Unit.

The Director of Communications and Public Affairs directly supervises all of the University's news services, public information services, special events and publications, and gives oversight to the management of the University's radio station.

The Director of Intercollegiate Athletics directly supervises all of the University's intercollegiate athletic programs involving both men and women athletic activities.

8

# DUTIES AND RESPONSIBILITIES OF THE PRESIDENT AND OF SENIOR OFFICERS REPORTING TO THE PRESIDENT

The duties and responsibilities of the President and of each of the senior reporting directly to the President are incorporated into official job descriptions are as follows:

## PRESIDENT

- Reports to the Board of Trustees and serves as Secretary of the Board.

- Serves as chief executive and administrative officer of the University.

- Advises the Board on the development of policies and regulations for the nance of the University, and implements these policies and regulations in dance with federal and state laws.

- Recommends to the Board an administrative organization that ensures ef administration and supervision of all units of the University.

- Provides professional leadership in promoting quality in the University's pr programs of instruction, academic support, student support, research and service.

- Recommends approval of the University's annual and long-range plans.

- Recommends approval of the University's annual budget, approves appro budget revisions and ensures proper control of budget expenditures.

- Serves as the University's principal agent for seeking appropriations fro Alabama State Legislature and for seeking other restricted and unrestricted grants and contracts from government agencies, foundations, corporations, a and individuals.

- Appoints all members of the faculty and staff subject to Board approval.

- Has authority to accept resignations, grant temporary leaves of absence an ate action to suspend or dismiss any employee in accordance with Board p and University personnel policies

9

- Recommends to the Board of Trustees all promotions and all awards of tenure for the members of the faculty.

- Presides at all public academic occasions, and represents the University before the public generally.

- Makes an annual report to the Board of Trustees on the work and condition of the University and on its current needs.

- Performs all other duties that are incidental to the Office of President.

## Vice President for Academic Affairs

- Provides leadership in the general area of educational programs and faculty affairs, serves as principal adviser to the University President, and keeps him or her fully informed on all significant academic matters.

- Administers policy on all facets of faculty affairs, including selection, retention, promotion, leave salaries, teaching loads, research and service activities of the academic staff.

- Initiates and supervises the development and implementation of performance evaluation procedures for faculty, deans, chairpersons and staff, and makes appropriate recommendation to the President for promotion, tenure, retention, dismissals, merit salary increments and transfers in keeping with University policy.

- Develops and recommends new academic programs for consideration by the President of the University, and reviews and recommends policies and approaches for strengthening existing offerings.

- Establishes the academic goals and timetables in consultation with the appropriate academic administrators and faculty and provides the supervision and direction necessary for the achievement of the same.

- Supervises the preparation of academic budgets and recommends them to the President on a timely basis.

- Reviews credentials, recommends all academic appointments to the President and ensures that all such selections promote the best interest of the institution.

- Develops and administers policy governing admissions, registration, academic recordkeeping, and academic staffing.

10

- Serves as Chairperson of the Council of Academic Deans.

- Screens all faculty and staff travel requests.

- Maintains a calendar of accreditation reviews and ensures that maximum pr tions are made for reaffirmations and for acquiring initial certification by ac ing agencies where appropriate.

- Performs all other job-related duties as directed by the University President.

**Vice President for Student Affairs**

- Recruits, selects and supervises Student Affairs staff.

- Provides leadership while working with the staff in development of policie procedures for Student Affairs.

- Provides administrative directions for all personnel in Student Affairs.

- Prepares budgets, develops long-range plans and makes recommenda regarding programs that will enhance the effectiveness of the area of St Affairs.

- Administers the policies of the University's system of student discipline.

- Directs and coordinates student disciplinary procedures.

- Prepares regular and special reports when required.

- Supervises student activities and programs of student development.

- Maintains student personnel files and supervises student citizenship.

- Evaluates and appraises the morale and achievement of students with the o tive of maintaining high academic, moral and spiritual levels.

- Serves on committees that require the representation of Student Affairs.

- Acts as ex-officio adviser to student organizations, giving special attention to ous organizational problems.

- Maintains close liaison with other areas of the University.

11

- Maintains liaison with parents and guardians.

- Performs all other job-related duties as directed by the President.

**Vice President for Fiscal Affairs**

- Administers annual operating budget including auxiliary enterprises, and coordinates budget reviews and analysis of administrative offices.

- Develops investment management policies.

- Develops, improves and interprets guidelines, regulations and procedures for effective fiscal management.

- Develops business management information systems.

- Administers fiscal aspects of the student financial assistance program.

- Coordinates business and financial operations with applicable laws and recommendations of the Examiners of Public Accounts.

- Refines the administrative organization from time to time to achieve maximum efficiency of business and financial operations.

- Plans and schedules financial reports.

- Has responsibility for assisting the President in the preparation, presentation and defense of the University's Appropriation Request to the Alabama Legislature and related state agencies.

- Performs any other duties and responsibilities assigned by the President.

**Vice President for Administrative Services and Advancement**

- Serves as a member of the President's Administrative Council.

- Oversees the operation of the University's personnel administration system, and ensures the adequacy of the system.

- Oversees the operation of the University's computer services system, and ensures that the system is adequate to support the needs of total program of management information, institutional research and long-range planning and institutional evaluation.

12

- Ensures that a total program of institutional research, long-range plannin
  institutional evaluation are developed in accordance with standards ·
  University's regional accrediting agency.

- Ensures the adequacy and efficiency of the University's plant operation and
  tenance system and its telephone communication system.

- Coordinates directly with outside contractors in the design and construction ·
  or renovated physical facilities on the campus.

- Assists the President in establishing the development goals of the  Univer:
  keeping with its approved long-range plan.

- Assists the President in organizing and implementing the University's progr
  fundraising from governmental agencies, private foundations, corporations,
  ni and individuals.

- Ensures that all gifts and grants to the University are properly acknowledge
  receipted.

- Prepares reports for the President and the Board of Trustees on the status ·
  University's overall fund-raising program.

- Performs any other duties that may be assigned by the President.


### Director of Communications and Public Affairs

- Supervises the preparation and distribution of all news about the Universit
  its activities to newspapers, radio stations and television stations.

- Oversees the operation of the University's radio station, and oversees the pre
  tion of all special programs and spot announcements about the University th:
  broadcast on any radio or television station.

- Oversees the preparation and editing of all University publications not specif
  assigned to another administrative unit and reviews and approves the final fo
  all University publications.

- Ensures that all information pertaining to the University's intercollegiate atl
  program is properly formulated and distributed.

- Ensures that appropriate photographs are made and distributed relative t·
  University's activities, and ensures that a photographic file is maintained.

13

- Serves as a public affairs liaison, for the University, to officials of state, county and city government.

- Coordinates the University's overall community relations program.

- Maintains an information program designed to facilitate the activities of visitors to the campus.

- Supervises the planning and coordination of University special events involving luncheons, receptions, conferences, dedications, exhibitions and the visits of campus special guests.

- Provides direct staff assistance to the President in carrying out his or her public relations activities on behalf of the University.

- Performs any other duties that may be assigned by the President.

### Director of Intercollegiate Athletics

- Ensures that all athletic programs are operating within the framework and guidelines of NCAA, SWAC and University policies.

- Oversees and authorizes approval of all travel for coaches and budgetary expenditures in every area of athletics to include the sports, trainers, managers, support staff and equipment.

- Ensures that eligibility forms are properly completed on time and are submitted to the various agencies.

- Acts as liaison and spokesperson for the Department of Intercollegiate Athletics.

- Secures officials for home games and is responsible for requesting funds to pay for such services.

- Recommends the hiring of personnel for all vacancies in the Athletic Department.

- Creates and establishes good rapport in the community as well as good public relations.
- Makes contact with alumni and friends of the University to solicit their support both financially and morally.

- Observes and evaluates all aspects of the athletic program, to include academics to ensure accountability and effective operation.

14

- Acts as a consultant and adviser to coaches and student athletes as well as m booster.

- Makes certain coaches are abreast of NCAA and SWAC rule changes and interpretations.

- Assists coaches in coordinating contests with opponents, including negotia contract stipulations, site locations, etc.

- Acts as a development officer or fund raiser as need dictates and where ther shortfalls to build a solid and sound athletic program.

- Supervises and coordinates the work of clerical staff.

- Monitors the athletic department budget, making certain that monies are able at all times as needed.

- Coordinates preparations and activities surrounding the All-Sports Banqu include securing a speaker and establishing a program format.

- Performs other duties as assigned by the President.

15

# INTRODUCTION

## I.   PURPOSE and USE of the HANDBOOK

The purpose of this *Handbook* is to provide nonacademic employees with administrative organizational rules, regulations, policies, procedures and general information for the handling of personnel matters relating to the nonacademic work force.

Each employee should become familiar with these policies and procedures. Please study this Handbook and keep it for use as a reference.  Cost factors may prevent each employee from having a personal copy of this Handbook; however, your supervisor or the Director of Personnel Services and Human Relations will make a copy available for your use upon request.

Since no one handbook can answer all the questions that an employee may have, the University encourages you to contact your supervisor or the Office of Personnel Services and Human Relations if you have additional questions or want further clarification of these policies and procedures.

## II.   DEFINITIONS

For purposes of this *Handbook*, the following definitions will apply:

**Academic Administrator:** Persons holding positions as professional librarians or holding one of the following administrative positions:  President, Vice President for Academic Affairs, Assistant Vice President for Academic Affairs, Academic Deans, Director of the Early Childhood Center, Director of Instructional Resource Center, Director of Testing and Pyschological Services, Director of Records and Registration, Director of Academic Advisement, Director of the Teacher Education Center, Director of Enrollment Management, Director of Aerospace Studies, Director of Trio Programs, Director of Teacher Certification Office, Coordinator of Freshman Orientation and Associate Coordinator of Freshman Orientation.  Persons holding these positions as academic administrators are members of the faculty but they may not gain tenure as academic administrators.  In addition, their positions as academic administrators are governed by the policies and procedures contained in the Nonacademic Staff Handbook.

**Nonacademic Employee:** All University employees who are not classified as faculty.

16

**Employee Supervisor:** A person who has responsibility for the superv of one or more persons and is responsible for administering the nonacademic sonnel policies and practices at the departmental level.

**Promotion:** Personnel action that advances an employee to a higher job sification.

**Demotion:** Personnel action that reduces an employee to a lower job cla cation.

**Lateral Transfer:** Personnel action that changes an employee's work as ment from one job to another with no change in wages or job classification.

**Singular Number:** Shall also import the plural and vice versa as applicab

**Racial Minority:** As applied to Alabama State University refers to non-bla

**Handicapped:** A person who (1) has a physical or mental impairment w substantially limits one or more major life activities, (2) has a record of such im ment or (3) is regarded as having such an impairment.

## III. SCOPE AND ORGANIZATION

**Scope:** This *Handbook* includes those personnel policies and procedures apply to all University nonacademic employees. However, there may be n detailed departmental instructions which relate to a specific department or which are not included in this *Handbook*.

## IV. RESPONSIBILITY OF THE OFFICE OF PERSONNEL SERVI( AND HUMAN RELATIONS

### A. New or Revised Procedures
### Distribution of Additions or Revisions
The Director of Personnel Services and Human Relations, upon approva the Board of Trustees, will be responsible for distributing all new or revised po and procedure statements.

### B. Updating Handbooks
It is important that all department heads and supervisors update this *Handi* with all additions and revisions issued by the Director of Personnel Services Human Relations as recommended by the President and approved by the Boar Trustees.

17

## C. Suggestions

A department head, supervisor or employee who has suggestions for changes or wishes to propose a new policy or procedure should submit his/her suggestions through channels in writing to the Director of Personnel Services and Human Relations.

# V. RIGHTS OF THE UNIVERSITY

Alabama State University is vitally interested in the opinions of its employees, expressed individually or through their department heads, about working conditions, ways and means of getting their jobs done better and other matters of interest to employees.

However, the University, in recognizing and accepting its responsibility to pro-vide the necessary services to ensure quality education for its students, must have the flexibility to make decisions without prior employee consultation. Therefore, the University must maintain exclusive discretion to exercise the customary functions of management, including, but not limited to, the discretion to select, hire, promote, suspend, dismiss, assign, supervise and discipline employees; to determine work schedules and the size and composition of the workforce; to establish, change and abolish policies, procedures, rules and regulations; to determine and modify position descriptions and position classification specifications; and to assign duties to employ-ees in accordance with the needs and requirements of the University.

# VI. APPLICABLE LAWS AND REGULATIONS

A. **Major Laws and Regulations.** The following laws and regulations have a significant impact on University personnel policies and procedures:

Executive Order 11246 as amended by Executive Order 11375

Title VII of the Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972

The Equal Pay Act of 1963 as amended by the Education Amendments of 1972

Title IX of the Education Amendments of 1972

Title VII and VIII of the Public Health Service Act of 1971 as amended by the Comprehensive Health Manpower Act and the Nurse Training Amendments Act of 1971

18

Sections 503 and 504 of the Rehabilitation Act of 1973 as amended i
Rehabilitation Amendments Act of 1974

Vietnam Era Veterans' Readjustment Act of 1972 as amended I
Vietnam Era Veterans' Readjustment Act of 1974

Charles R. Craig, et. al., vs. Alabama State University, et. al., 76
United States District Court for the Middle District of Alabama, N
1978, Order

Lee vs. Macon County Board of Education, 267 F Supp. 458, 474
Ala.), Aff'd., 389 U.S. 215 (1967).

The Alabama Anti-Nepotism Law

**B.  University Adherence to Laws and Regulations.** It is the policy
University to comply with these laws to the fullest extent. Failure to
ply with these laws and regulations may result in increasing feder:
state intervention, loss of funds and/or legal action against bot
University and its employees.

19

# SECTION 1.0
## CLASSIFICATION OF POSITIONS AND EMPLOYEE SERVICE STATUS

### 1.1 CLASSIFICATION OF POSITIONS

Every position at the University is designated according to five different forms of employment classification which in turn determine how various personnel policies are applied to that position as well as how employee benefits are administered to persons holding that position. Thus, every employee should be clear regarding the various kinds of classification that apply to the position that he or she holds.

One means by which positions are classified is according to six broad job categories that are reported by the University to the Equal Employment Opportunity Commission (EEOC). The classification of employment under this method is as follows:

<u>Executive, Administrative and Managerial:</u> All positions requiring major responsibility for the management or general business operation of the University or of a department or subdivision thereof.

Positions in this category include president, vice president, assistant vice president, dean, assistant dean, academic department chairperson, controller and those positions that carry the title of director and which supervise the following units: Communications and Public Affairs, Intercollegiate Athletics, Institute for Social Research and Governmental Services, Small Business Development and Urban Economic Research Centers, Teacher Education Center, Office of Professional Laboratory Experiences, College of Education Certification Office, Office of Off-Campus Sites, Academic Advisement Center, Library and Learning Resources, Instructional Resource Center, Enrollment Management, Records and Registration, Counseling and Student Development, Career Planning and Placement, Health Services, Student Activities, University Police and Security, University Center, Student Housing Services, Residential Life, Student Financial Aid, Purchasing, Auxiliary Enterprises, Personnel Services and Human Relations, Computing and Information Services, Development and Title III Programs, Alumni Relations and Development Services, and Physical Plant.

<u>Professional Non-Faculty:</u> All positions that do not carry faculty rank and require at least a bachelor's degree or require specialized professional training that is comparable to a bachelor's degree or require a combination of training and experience of such kind as to be comparable to a bachelor's degree.

20

Positions include accountants, employment manager, systems analyst athletic coaches.

Clerical and Secretarial: All positions that relate to clerical or secretarial a ties involving internal and external communications, recording and retri of data or information, and other paperwork required in an office.

Positions include secretaries, clerk-typists, accounting clerks, office mac operators, statistical clerks, payroll clerks, sales clerks, and library clerks.

Technical and Paraprofessional: All positions requiring specialized knowl or skills that require experience or academic work such as is offered in year technical institutions, junior colleges or equivalent on-the-job training:

This category includes computer operators, computer programmers, m matical aides, licensed practical nurses, photographers, radio operators, ratory assistants and laboratory technicians.

Skilled Crafts: All positions that typically require special manual s acquired through on-the-job training or through apprenticeship or other fo training programs.

This category includes mechanics, repairers, electricians, stationary engine skilled machinists, carpenters, plumbers, painters and typesetters.

Service and Maintenance: All positions requiring limited degrees of previo acquired skills, the performance of which results in or contributes to the c fort, convenience and hygiene of personnel and the student body or which tributes to the maintenance of University buildings, facilities or grounds.

This category includes vehicle drivers, general laborers, custodi groundskeepers and security personnel.

A second means by which positions are classified is according to whether are permanent or temporary. The classification of positions under this me is as follows:

Permanent Position: A position that is in the current budget of the Univer and for which current University plans or programs include no definite date discontinuance of the position.

Temporary Position: A position that is in the current budget of the Univer and for which current University plans or programs include a definite date discontinuance of the position. Every position established as part of a joint ject between the University and an outside agency shall be designated temporary position without regard to the source of funding for the position.

A third means by which positions are classified is according to the number of months within the fiscal year that the position functions. The classification of positions under this method is as follows:

Twelve-Month Position: A position that functions during each of the 12 months of the fiscal year with the employee who fills such a position normally eligible to accrue annual leave during that period.

Nine-Month Position: A position that functions only during the nine months of the regular fall and spring semesters with the faculty employees who fill such positions normally not eligible to accrue annual leave during that period. The most numerous nine-month positions are those that include teaching faculty and residence hall supervisors.

A fourth means by which positions are classified is according to the number of hours within a work week they are scheduled to operate. The classification of positions under this method is as follows:

Full-time Position: A position that requires the employee filling it to render 30 hours or more of service per week on a regular schedule.

Part-time Position: A position that requires the employee filling it to render less than 30 hours of service per week on a regular schedule. Such employees are not eligible to achieve permanent status or University benefits.

Substitute Position: A position that does not require the employee filling it to render a fixed number of hours of service per week or to follow a regular work schedule. Persons filling such positions are on a standby or "on-call" basis and are most commonly employed as staff members in the student residence halls and the radio station. Such employees are not eligible to achieve permanent employee status and are not eligible to receive any University benefits.

A fifth means by which positions are classified is according to whether they are exempt or nonexempt from the minimum wage and overtime compensation provisions of the U. S. Fair Labor Standards Act. The classification of positions under this method is as follows:

Exempt Position: A position that meets all of the tests of the Fair Labor Standards Act relating to job responsibilities, supervision, authority and salary that are necessary for classification under the law as administrative, executive or professional.

Nonexempt Position: A position that does not meet all of the tests defined above for classification under the law as administrative, executive or professional.

22

## 1.2 EMPLOYEE SERVICE STATUS

Every employee is classified according to four of the five different categor[ies]
positions previously described. In addition, each employee is further catego[rized]
according to the employee's service status as follows:

Temporary Employee: An employee who fills a temporary position or wh[o fills]
a permanent position on an acting basis for a limited term until either a pe[rma]-
nent employee returns to the position from a leave of absence or until a se[arch]
is completed for a new probationary employee.

Probationary Employee: A full-time employee who is appointed to [the]
University to fill a permanent position or who is promoted from withir
University to fill a permanent position and who has not completed the requ[ired]
term of continuous and satisfactory service in the position that is necessa[ry to]
advance beyond probationary status. Persons newly appointed as exec[utive]
status employees (see below) do not serve a probationary period.

Permanent Employee: A full-time employee who has completed the requ[ired]
term of continuous and satisfactory probationary service in a permanent [posi]-
tion and who has been designated as a permanent employee. A perma[nent]
employee may take a leave of absence from a permanent position to fill a [tem]-
porary position at the University without losing his or her permanent empl[oyment]
status at the University or his or her right to return to the permanent pos[ition]
when the term of the temporary position has ended. Persons appointe[d to]
positions as executive status employees (see below) serve at the pleasu[re of]
the President or Board of Trustees and are not eligible to achieve perma[nent]
employee status. An employee on permanent status may be re-assigne[d to]
another job without losing permanent status of employment at the Univer[sity.]
Persons appointed to laboratory staff positions must meet additional req[uire]-
ments prescribed elsewhere in this Handbook before being eligible to ach[ieve]
permanent employee status.

Executive Status Employee: An employee who fills a permanent senior-[level]
staff position that does not carry with it the authority to convey perma[nent]
employee status. These include all positions of Vice President, Assistant
President, Dean, Director of Library and Learning Resources, Contro[ller,]
Director of Computing and Information Services, Director of Physical P[lant,]
Director of Communications and Public Affairs and Director of Intercolle[giate]
Athletics.

23

# SECTION 2.0
## EMPLOYMENT POLICIES

## 2.1  EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION

It is the policy and practice of Alabama State University to recruit, hire, compensate, train, reassign and promote employees without discrimination on the basis of race, religion, color, physical disability, national origin, sex, marital status, political affiliation or age, except where physical disability, sex or age constitutes a bona fide occupational disqualification or where an individual with a physical disability is not otherwise qualified for employment or where a decision based on age is pursuant to a bona fide seniority system or a bona fide employee benefit plan, such as a retirement, pension or insurance plan.  It is also the policy and practice of the University to take affirmative action to prevent discrimination on the basis of race, color, religion, sex, national origin, age or physical disability, including specific adherence to the University's Affirmative Action Plan.  The policy applies to all levels and phases of personnel administration, such as recruitment, advertising activities, testing, hiring, compensation, training, reassignment and promotion.

Applicants and employees who have reason to believe their treatment is in violation of the Equal Employment Opportunity policy should promptly report the circumstances of alleged violation, in writing, in accordance with the procedures set forth in the University's Affirmative Action Plan.  A copy of the University's Affirmative Action Plan is available for inspection in the University Library and in the University's Office of Personnel Services and Human Relations.

## 2.2  EMPLOYMENT ELIGIBILITY GUIDELINES

2.2.1  MINIMUM JOB REQUIREMENTS.  The minimum requirements for your job and other jobs have been determined and are available through the Office of Personnel Services and Human Relations.

2.2.2  AGE REQUIREMENTS.  To be employed at Alabama State University as a employee, one must be at least 18 years of age, except students.

2.2.3  EMPLOYMENT OF RELATIVES.  The University will allow more than one member of an immediate family to be employed at the University in accordance with the following provisions:

1) Such hiring must conform to the State of Alabama anti-nepotism law (Alabama Code, Section 41-1-5), which provides that "No officer or employee of the state shall appoint any person related to him within the fourth degree of affinity or consanguinity to any job, position or office of profit in the state."

24

2) Such hiring does not discriminate against other candidates for the position.

3) No officer or employee of the University shall be permitted to exercise supervision over persons related to him or her by family or marriage. For p es of this policy, persons related by family or marriage are defined as a spous ent, child, brother, sister, grandparent, grandchild, aunt, uncle, niece, nephe laws and persons for whom the employee has been assigned legal responsib a guardianship capacity.

The President of the University or his/her designee must grant final app in each case where the University is considering hiring more than one person ed by family or marriage to work in the same department.

**2.2.4 ALIENS.** An alien may be employed by the University provided h has legal proof of a right to work in the United States as indicated by an app visa or work permit.

**2.2.5 EMPLOYMENT OF ATHLETIC COACH.** No individual m employed in a head coaching capacity who has been officially sanctioned b National Collegiate Athletic Association (NCAA) or an NCAA member confe for violating NCAA or conference rules.

**2.2.6 REEMPLOYMENT OF FORMER EMPLOYEES.** A former employee resigns from the University in good standing and is subsequently reemployed afte days will be considered a new employee for purposes of seniority and sick l However, at the employee's option, accrued sick leave may be transferred t Teachers' Retirement System of Alabama for service credit toward retirement if ap tion is made within 180 days of resigning from the University.

A former employee who is reemployed after 180 calendar days may be r ployed in the same type of employment or in another type of employment for w he/she is qualified.

## 2.3 RECRUITMENT, SCREENING AND APPOINTMENT

The University actively and affirmatively places emphasis on the recruit and screening of women and non-black applicants. In addition, the University a itself of the traditional channels of recruitment which include the Alabama ! Employment Service, advertisements in newspapers and professional journals, pus newspapers and community and technical colleges. All advertisements wil play that the University is an "Affirmative Action/Equal Opportunity Employer."

25

Persons seeking employment at Alabama State University are referred to the Office of Personnel Services and Human Relations for securing applications and information on available positions.

Recruitment activities are centralized in the Office of Personnel Services and Human Relations. All available vacancies and new positions will be listed with the Office of Personnel Services and Human Relations immediately upon approval by the President.

Each available permanent position to be filled will be appropriately advertised, and a notice will be posted on the Office of Personnel Services and Human Relations bulletin board and in accessible locations for employees.

A work permit, if required by law, shall be secured by the applicant and filed in the Office of Personnel Services and Human Relations.

During initial screening, the Director of Personnel Services and Human Relations will delete all applicants who are not eligible or qualified based on announced criteria for the position.

Applicants for all administrative positions at the level of Director or equivalent and above will be screened and evaluated by a screening committee. The committee will be composed of the Director of Personnel Services and Human Relations, immediate supervisor and/or other persons appointed by the area Vice President. A technical consultant may be added when, in the opinion of the committee, circumstances warrant. The screening committee will submit the top three names to the area Vice President who will make recommendation to the President, and the President will make the final appointment subject to approval by the Board of Trustees.

No person is considered employed until a written contract is signed by both the President and the employee and has been approved by the Board of Trustees. No supervisor or officer is authorized to make an oral or written commitment of employment to any applicant. No contract shall be executed between the University and an employee that is inconsistent with the policies contained in this Handbook.

Objective criteria are the primary basis for selection. Each applicant is considered on the basis of his/her skills, knowledge and abilities.

Each applicant applying for a clerical/data entry position will be required to take a typing/data entry test administered via the Office of Personnel Services and Human Relations.

Any evaluation in terms of skills, knowledge and abilities used to determine the qualification of applicants seeking employment for a certain position shall also be used for the evaluation of all applicants seeking that position.

26

## 2.4 INITIAL BRIEFING AND GENERAL ORIENTATION FOR EMPLOYEES

New employees are introduced to the University through an initial in briefing conducted by the Office of Personnel Services and Human Relation in three working days following employment. A general orientation prog conducted within 30 days of employment.

Subsequent orientation is continued within respective departments supervisor or designee. New employees should not hesitate to request assi if they feel the need beyond the general orientation provided.

## 2.5 PROBATIONARY EMPLOYMENT PERIOD

The purposes of the probationary period of employment are as follows:

1) To orient and train the new employee so that he or she will know the assignments and understand both the work environment and the standa performance and behavior required of the position.

2) To determine whether the performance of the new employee have be isfactory so that he or she may either achieve the status of a perm employee, be transferred to another more suitable position or be termina

3) To permit the new employee to evaluate the position, the organizatio the supervisor in order to determine whether he or she wants to contir the position.

The length of the probationary period differs according to the category of tion that the employee is filling. Thus a 24 month probationary period sh required of all employees appointed or promoted to positions that fall into the gories of clerical/secretarial, technical/paraprofessional, service and maintei and skilled crafts. A 48 month probationary period shall be required of all en ees appointed or promoted to positions that fall into the category of profess nonfaculty, executive, administrative and managerial unless such employee specifically designated as executive-status employees. Persons specifically nated as executive-status employees are not eligible for permanent status and do not complete a probationary period of employment.

During the first year of the probationary period of employment, the emp shall undergo two performance evaluations-one at the end of six months and o the end of 1 year-and the results of these two performance evaluations shall deter

27

whether the appointment of the probationary employee will be renewed for a second year. Probationary employees shall thereafter be evaluated at least once per year, but supervisors have authority to carry out additional performance evaluations at any time during the probationary period. The University reserves the right to terminate a probationary employee at any time during or at the end of the probationary period. However, no probationary employee shall be terminated without a 15 day prior notice of termination, and probationary employees holding positions that require a 48 month probationary period shall be terminated only with a 30 day notice of termination.

A probationary employee who alleges that such termination violates ASU policies or state or federal law, may appeal such termination in accordance with procedures set forth elsewhere in this manual.

## 2.6  RIGHT TO PERMANENT EMPLOYMENT STATUS

Subsequent to the satisfactory completion of the prescribed probationary employment, the employee shall gain the right to permanent employment status at that level and may not be dismissed except through due process procedures set forth elsewhere in this manual.

Certain non-faculty administrative positions are considered to be managerial positions. Persons serving in these positions will not earn tenure or permanency in their respective positions as managers. However, persons serving in these positions who have rendered six or more consecutive years of satisfactory service will earn the right to employment at the University subject to job availability. This includes all positions with EEOC codes of 3.

## 2.7 EMPLOYEE SERVICE STATUS OF LABORATORY STAFF PERSONNEL

Persons holding positions with the titles of Laboratory Instructor, Laboratory Manager, Laboratory Coordinator, Laboratory Curator, Laboratory Assistant, Laboratory Research Assistant, Laboratory Technician or Laboratory Tutor may not serve more than four years in such positions and may not achieve permanent employee status unless such persons either hold a master's degree in the appropriate subject area or else hold a bachelor's degree and have completed 15 years of prior teaching service outside of the University in the subject area to which they are assigned.

## 2.8 OTHER CHANGES IN EMPLOYMENT STATUS

2.8.1 LATERAL TRANSFER. A lateral transfer occurs when an employee moves from one position at the University to another position at the University and both

28

positions have the same salary grade. Such a transfer may be voluntary to acco
date the desire of the employee to gain additional experience and to grow profe
ally. In addition, such a transfer may be involuntary to accommodate the ne
the University, and the University reserves the right to make such transfers. I
transfers require that all affected supervisors and the President approve the tran

To apply for a transfer, the employee must complete an application for en
ment at the Office of Personnel Services and Human Relations. It is require
he/she notify the current supervisor of his/her interest in being considered
vacant position prior to being referred for an interview.

2.8.2 DEMOTION. If an employee's job performance is below standar
supervisor will work with the employee to try to raise it to a satisfactory level.
performance does not improve, the University may determine that its best int
require that the employee be demoted. Demotion involves either movin
employee to another position at a lower salary grade level or reclassifyin
employee's existing position to a lower salary grade level. Demotion will
result in a reduction in the employee's salary, but such demotion shall only
place following prior notification to the employee, in accordance with proce
for cancellation of contract that are described elsewhere in this Handbook a
accordance with due process procedures.

Employees who voluntarily transfer from one University position to an
one at a lower salary grade will be paid in accordance with the lower salary pi
ed under the new position and not in accordance with the higher salary paid t
the previous position.

## 2.9 DUAL EMPLOYMENT

An employee of the University may not hold more than one full-time po
with the University inclusive of temporary employment.

## 2.10 OUTSIDE EMPLOYMENT

An employee may work at another job outside the University provided the
side employment does not interfere with the performance of his/her job a
University, does not violate University regulations or policies and does not brin
credit to the University. Before accepting other employment outside the Unive
the employee should obtain approval from both the immediate Supervisor
Director of Personnel Services and Human Relations to make certain that it doe
interfere with the performance of his/her job at the University, does not devel
promote a conflict of interest and does not bring discredit to the University.

## 2.11  SERVICE PERIODS

The service period of an employee is that time period during which he/she has uninterrupted service as an employee of the University.

## 2.12  PERSONNEL RECORDS

2.12.1 MAINTAINING OFFICIAL PERSONNEL FILES.  There is only one official personnel file for each employee, and it is maintained in a locked file cabinet in the Office of Personnel Services and Human Relations.  Confidentiality of all files shall be maintained, and no anonymous material shall be placed in the official personnel file.

The official personnel file shall contain the following kinds of documents pertaining to an employee:

- Application for employment

- Personnel information sheet

- Official copies of transcripts certifying degrees and certificates received or documents certifying licenses received

- Employment history at the University

- Benefit plans in which enrolled and in which dependents are enrolled

- Record of annual leave, sick leave and other leaves taken

- Personnel Action Forms

- Reports of disciplinary actions taken, including written reprimands, disciplinary probations, suspensions and terminations

- Reports of grievance and appeals hearings

- Performance Evaluations

In addition, the University may retain a pre-employment file which also shall be confidential and contain letters of reference, ratings and other materials related thereto.  An employee shall not have access to the official, confidential pre-employment file.

When material which could cause cancellation of contract is added to an employee's official personnel file, he/she will be notified promptly by the Director of Personnel Services and Human Relations.  The employee will have the right to make responses deemed appropriate but will have no right to remove any material from the file.

**2.12.2 ACCESS TO PERSONNEL FILES.** An employee shall have acce his/her official personnel file during normal operating hours of the Offi Personnel Services and Human Relations provided there shall be no undue int ence with the normal routine of the office. Under no circumstances shall the o personnel file be removed from the office by the employee, and access to th shall be given only in the presence of someone assigned to the Office of Pers Services and Human Relations.

In addition to the employee, only the President or his/her designee employee's Vice President or Director, the Dean, Chairperson or comparable supervisor may have access to the official personnel file without written app from the employee. Members of the Board of Trustees may review files i office of the Director of Personnel Services and Human Relations. All req from board members must be made through the Office of the President. Whe Board is in session, files may be reviewed in the Board Room. An employee request that a board member receive a copy of his/her file, but any abnormal of copying must be at the expense of the employee.

If the official personnel file is duly subpoenaed in accordance with law employee shall be notified at the earliest possible time.

Any duly constituted committee reviewing the employment status o employee will be afforded access to his/her file.

The information contained within the personnel record is used for employ related purposes; for example, in evaluation of work performance, consideratio a promotion or transfer and verification of employment. Each employee is req ed to review his/her personnel record during his/her birth month each year ar sign the Record Review Form attached to the front of the personnel record.

**2.12.3 REPORTING CHANGES IN THE PERSONNEL RECORD.** E employee is required to report any change in name, address, telephone num marital status and number of dependents as well as any award of newly ea degrees or certificates to his or her supervisor and to the Office of Perso Services and Human Relations. The University will not be responsible for no ceipt of any official communication sent to an employee if the employee has fa to file a change of address notice with the Office of Personnel Services and Hu Relations.

Should an employee need to change the number of depender allowances listed for income tax purposes on Forms W-4 or A-4, it will be neces to secure, complete and return new forms to the Office of Personnel Services Human Relations.

31

# SECTION 3.0
## EMPLOYEE ATTENDANCE AND LEAVE BENEFITS

### 3.1 WORK SCHEDULES

3.1.1 NORMAL AND SPECIAL WORK SCHEDULES. An employee is expected to work regularly scheduled hours established by the University and the supervisor. Each employee is normally assigned a maximum of 40 hours per week unless otherwise approved by the Director of Personnel Services and Human Relations and/or the University President.

The normal operating hours for instructional and administrative offices are from 8:00 a.m. to 5:00 p.m., Monday through Friday. When possible, employee lunch periods shall be staggered to provide coverage of the office during the noon hour.

Any changes in an instructional department's work schedule must have the approval of the Vice President for Academic Affairs and be filed with the Director of Personnel Services and Human Relations. Exceptions are made to provide support for activities that operate after normal work hours and on weekends.

Each employee's special work schedule must be approved by the Director of Personnel Services and Human Relations and filed in the Office of Personnel Services and Human Relations.

Any change in a department's normal work schedule should be announced so as to give employees as much advance notice as possible.

A work week is from 12:01 a.m. Sunday through 12:00 midnight the following Saturday except in areas that operate 24 hours per day where a work week is from 7:01 a.m. Sunday through 7:00 a.m. the following Sunday.

3.1.2 BREAKS OR REST PERIODS. When working conditions permit nonexempt employees may be allowed two 15 minute breaks each day-one before the lunch period and the other after the lunch period. Breaks and rest periods will be taken on campus.

Rest periods and meal periods are noncumulative and shall not be used to leave work earlier, arrive later or extend meal times.

3.1.3 OVERTIME WORK ASSIGNMENTS. If the position classification occupied is nonexempt under the provisions of the Fair Labor Standards Act, an employee will be paid overtime pay at the rate of one and one-half the regular hourly rate of

32

pay for all hours <u>worked</u> over 40 within a seven-day workweek. In lieu of cash ment for overtime worked, the University, at its option, may award compens time at a time and one-half rate. The Supervisor shall inform the employee he/she will receive compensatory time before the overtime begins.

Holidays, sick leave and annual leave are not considered as hours wo when computing overtime.

No supervisor is authorized to permit a nonexempt employee to earn ove pay or compensatory time without the prior approval of the Director of Perso Services and Human Relations and the Vice President for Fiscal Affairs or designees.

The request for overtime or compensatory time work must be in wri specifically stating the need for a nonexempt employee to work overtime an number of hours involved.

In case of an emergency, verbal approval may be granted followed by a wi request before the end of the next regular workday.

### 3.1.4 COMPENSATORY TIME OFF. The following policy and guideline established governing compensatory time:

1. Exempt employees do not earn compensatory time-off or extra compe tion for hours worked in excess of forty (40) hours per week.

2. Accumulated compensatory time may not exceed two hundred forty h of overtime. After two hundred forty hours, a nonexempt employee r be given his/her compensatory time or be paid for the time.

3. A copy of the letter of approval for compensatory time must be attache the time sheet/card for the period in which the compensatory time taken. All earned compensatory time must be reported to the Directo Personnel Services and Human Relations on the time sheet for the peri

### 3.1.5 ACCOMMODATING THE WORK SCHEDULE FOR RELIGIO OBSERVANCES. The University and its employees will not discriminate on basis of an employee's religious belief. When a workplace religious accomm tion is sought, the University will use its best efforts to accommodate the emp ee's religious belief provided that no undue hardship is created for the Univer or its employees and the accommodation does not affect safety or health.

### 3.1.6 EMERGENCY CLOSINGS AND CALL BACKS. Employee safety is a mary University concern. Should a situation arise, such as a prolonged power

33

ure or some other working condition which prevents an employee from performing normal duties or other appropriate substituted duties, the employee may be excused by the supervisor after the latter has conferred with the Director of Personnel Services and Human Relations. If it is determined that the employee is performing an essential service during emergencies, he/she will be so designated. If an employee is considered essential during an emergency, he/she should contact his/her supervisor immediately. An employee will not be paid for work not performed unless he/she is advised by the supervisor not to report for work, in which case the employee shall suffer no loss of pay.

Any full-time employee who reports to work at the beginning of a regularly scheduled shift and for whom no work is provided that day shall be paid for that day, provided the employee has not been notified a minimum of two hours before the start of the shift not to report to work. Any full-time, nonexempt employee who is called back to work after a regular full day of work shall receive a minimum of two hours of pay at the regular rate of pay provided that the employee does not exceed 40 hours of work within that workweek.

## 3.2 ATTENDANCE, TIME CARDS AND TIMEKEEPING

The Payroll Certification Form is the official record of attendance for monthly paid employees and must be documented daily. The Employee Record of Hours Worked is the official record of attendance for biweekly paid employees and must be documented daily. Both the Payroll Certification and Employee Record of Hours Worked will be referred to hereafter as "time and attendance records."

Each employee will be required to complete and sign his/her time and attendance record at the end of each pay period.

The supervisor is responsible for maintaining the time and attendance record. Where time cards are used, clocking another employee's time card in or out is just cause for immediate dismissal. This also applies to the signing of another employee's time sheet.

Each employee is expected to be on time daily and to remain on the job throughout the regularly scheduled working hours. An employee having an urgent reason for leaving must obtain permission from the supervisor and/or Department Head prior to leaving the duty station.

Time and attendance reports must be turned in to the Payroll Officer no later than 9:00 a.m. on the first work day following the closing of a pay period. Late submission of these reports may delay an employee's paycheck until the next bi-weekly or monthly payroll, whichever comes first.

One-half hour will be the smallest unit of time for which an employee w paid.

Any changes, alterations or notations made on the time and attendance r must be approved by the supervisor.

An employee absent from duty without prior approval should give notice t immediate supervisor no later than one hour after duty begins but prefe before the beginning of the workday so that duties can be realigned in an or fashion.

Nonexempt employees are neither permitted nor allowed to work fo before or after their scheduled time. Any deviation from this policy must accordance with overtime procedures described elsewhere in this Handbook.

## 3.3 HOLIDAYS

The University observes the following nine paid holidays:

1. New Year's Day
2. Dr. Martin L. King's Birthday
3. Good Friday
4. Independence Day
5. Labor Day

6. Thanksgiving Day
7. Friday after Thanksgiving
8. Christmas Eve
9. Christmas Day

An employee will be given alternative days off if scheduled to work on a de nated holiday. If a holiday falls on Sunday, Monday will be observed as the holi If a holiday falls on Saturday, Friday will be observed as the holiday.

In addition, at his/her discretion the President may designate other day "off-days" for University employees.

An employee is eligible for holiday pay or equal time in the same fiscal yea addition to normal pay if he/she is scheduled to work on a holiday.

If an employee is a full-time employee, holiday pay is computed at the reg rate of pay for eight hours.

If an employee is a part-time employee, he/she is not entitled to holiday pa other University fringe benefits.

Holiday pay is not counted as "hours worked" and will not be included in c puting overtime in any pay period.

35

Should an employee be required to work on a holiday or if one's regularly scheduled day off falls on a holiday, at the discretion of the supervisor the employee may be given a substitute day off or paid for the holiday.

Unless on prior approved leave, all employees must work the day before and the day after the holiday. An employee who is paid on an hourly basis may, at the discretion of the Director of Personnel Services and Human Relations, be given compensatory time off or receive time and one-half compensation for work done on a holiday.

An employee wishing to take annual leave immediately prior to or immediately following a holiday must have specific approval of the immediate supervisor.

## 3.4 ANNUAL LEAVE

A full-time employee who normally works thirty-five hours or more each week will accrue credit for annual leave.

An employee earns annual leave credits for all hours in which he/she is considered to be in active pay status, which includes but is not limited to:

> Normal work hours
> Paid annual leave
> Paid sick leave (not to exceed eight days per month)
> Paid jury duty
> Paid military leave

One year of employment for increased annual leave credits is computed on the basis of continuous and uninterrupted active service beginning with the most recent date of employment.

Calculation of annual leave time will be computed as follows:

1. All full-time employees with less than 60 months of continuous service with the University shall earn annual leave at the rate of 12 days per year of service or 96 hours per year of service or .04615 of an hour for each hour of service.

2. Upon completion of 60 months or more of continuous service with the University, all full-time employees shall earn annual leave days according to the following schedule:

36

| Months of Continuous Service | Days of Annual Leave Accrued Per Year | Accrued Per Ho |
|---|---|---|
| 60-119 | 15 | .0576 |
| 120-239 | 18 | .0692 |
| 240-Over | 24 | .0923 |

3.  The maximum number of annual leave days that one may accrue is.:

4.  An employee may not borrow annual leave time in advance, but w approval of his or her Supervisor, an employee may take leave v pay.

Should an employee be on annual leave during an official paid holida time will not be charged against the employee's annual leave account. If re ed, the supervisor may agree to extend annual leave by the time equivalent of the holiday.

An employee should request annual leave at least one month in advan ensure that his/her absence will not interfere with the work of the departm unit.

If an employee leaves the University in good standing with unused annua or compensatory time that has been properly documented in the Office of Per Services and Human Relations, the employee shall receive terminal pay at h current rate for all such unused time.

The smallest unit of annual leave that can be credited to the record is one l

The new employee is eligible to use annual leave during the probati period to the extent earned.

An employee does not earn annual leave if absent on sick leave eight or workdays during the month.

## 3.5 SICK LEAVE

Sick leave is earned at the rate of one day per month of actual service, e ing the summer term for nine-month employees. Earned sick leave may be c over from year to year until the maximum of 180 days is reached as prescrib Alabama law.

Sick leave may be used in the event of illness (which shall include pregn related physical disability) of the employee or a member of his or her imm family. Sick leave may be used where unusually strong personal ties exist due

37

employee having been supported or educated by a person other than parents, brothers, sisters or spouse.   In cases where the employee is unable to resume active employment as certified by a licensed physician, sick leave shall be granted with pay for up to 180 days depending upon the employee's sick leave accumulation. When all sick leave and annual leave have been exhausted, the employee may apply for leave of absence without pay, and such leave will normally be granted.

The University may, at its discretion, require an employee to provide a statement from a licensed physician indicating that (a) the return of the employee to work after the use of sick leave does not pose a threat to the health of students or University employees or (b) sick leave was not used for purposes other than those permitted by this section.

Employees must inform the supervisor of the nature of the illness or reason for absence and how long it is anticipated to last. The supervisor may require the employee to provide a physician's slip for sick leave absence exceeding three days. Failure to communicate with the supervisor for three consecutive days of absence may be considered as job abandonment. The position may then be considered vacant and action initiated to recruit a replacement.

Full-time employees accrue sick leave benefits from the first day of employment at a rate of .04615 of an hour of sick leave for each hour worked up to 40 hours of work per week. This equals one day per month or 12 days of sick leave per year if paid for 2,080 hours during a complete year. Example: .04615 X 2,080 hours worked = 96 hours or 12 days sick leave.  The maximum number of sick leave days an employee may accrue is 180 days or 1440 hours.

An employee does not accrue sick leave while absent on sick leave for eight or more workdays during the month.

The smallest unit of sick leave that can be credited to the leave record is one hour.

An employee earns sick leave credits for all hours that he/she is considered to be in actual service pay status, which includes but is not limited to:

> Normal work hours
> Paid annual leave
> Paid sick leave (not to exceed eight days per month)
> Paid jury duty
> Paid military leave

Any employees who are resigning from the work force may transfer accrued sick leave up to a maximum of 180 days to membership service in the Teachers'

Retirement System of Alabama. These unused sick leave days can be used for ment credits or transferred to other participating agencies providing the sick le approved. Employees who are retiring must convert such leave to the Tea Retirement System of Alabama.

If an employee is ill during a holiday, he/she will be granted holiday pay i of sick pay on a day-to-day basis. Sick leave cannot be used for annual leave; ever, annual leave can be used for sick leave.

The supervisor has the responsibility for ensuring that each employee sick leave for its legitimate purpose. If the supervisor is not satisfied tha leave is used properly, he/she may deny approval of sick pay. Additionally, : of sick leave is grounds for disciplinary action.

The new employee is eligible to use sick leave during the probationary p to the extent earned. An employee who was retrenched and returned to the force within 12 months may be restored unused sick leave in excess of the days used to calculate paid sick leave.

## 3.6 UNPAID LEAVE OF ABSENCE FOR MEDICAL REASONS

A permanent employee unable to work for medical reasons and who can port the request by providing medical evidence may be granted a medical without pay for a period of time not to exceed 180 calendar days.

A request for a medical leave of absence must be submitted in writing, in ing medical evidence, to the University President through the Supervisor, Dire area Vice President and the Director of Personnel Services and Human Relatio

An employee granted medical leave will be entitled to return to the fo position or a comparable one in the same department/division or another de ment/division at the same salary.

During an approved medical leave of absence, the employee may participa the Group Medical, Disability and Life Insurance programs by paying the full pi ums but will not receive any holiday pay or accrue any sick or annual leave be while on medical leave. Length of service will continue to accumulate durin unpaid leave of absence but will not be used when computing sick and annual l benefits, Teachers' Retirement System benefits, or time worked necessary for sideration for an increase in pay. The employee must notify his/her Supervis least two weeks before the end of his/her medical leave of absence.

39

## 3.7  UNPAID LEAVE OF ABSENCE FOR PERSONAL OR PROFESSION-AL REASONS

A permanent employee may be granted an unpaid leave of absence, normally not to exceed one year.

A permanent employee who wants to take such a leave must submit a written request to his/her supervisor in advance defining the reason for the leave and the beginning and ending dates of the leave. The leave must be recommended by the divisional vice president and approved by the President. Each request will be evaluated on an individual basis.

In unusual circumstances, special consideration may be given to a request for a longer leave of absence provided it is believed to be in the best interest of the University.

Benefits earned prior to unpaid leave of absence remain during leave. No annual or sick leave are accrued or paid during the unpaid leave of absence.

Group medical and disability/life insurance may be continued while in an unpaid leave of absence status. However, the employee must make direct payment of premium cost for these benefits using a personal check, cashier's check or money order. It is the employee's responsibility to make arrangements for continued coverage with the Payroll Office and Office of Personnel Services and Human Relations prior to taking leave of absence.

## 3.8  MATERNITY AND PARENTAL CARE LEAVE

Whenever possible, an employee requesting maternity or parental care leave shall submit to the Director of Personnel Services and Human Relations written notification at least 30 days in advance of the date on which the requested leave is expected to begin. Such leave shall be granted for a period not to exceed six months, unless the necessity of a longer period is certified by the attending physician. During this period, an employee shall be entitled to use all of his or her accrued annual leave for any part of the maternity or parental care leave and all of his or her sick leave for any part of said leave that meets the purposes set forth elsewhere in this Handbook. All other periods of leave related to maternity or parental care shall be without pay.

An employee shall not be required to leave prior to parturition unless she can no longer satisfactorily perform the duties of her position as determined by a licensed physician.

40

Unused sick leave shall be carried over until the employee returns to p
nent employment. An employee shall not earn sick or annual leave wh
maternity or parental care leave.

Following the end of maternity or parental care leave, the employee sh
offered reinstatement to his/her original position. If the original position do
exist, the employee shall be offered reinstatement to a position of comparab
tus, pay and benefits.

## 3.9 BEREAVEMENT LEAVE

A employee shall, upon request, be granted up to four days annua
bereavement leave for the death of a parent, spouse, child, brother or sister, i
parent, grandchild, son or daughter-in-law, mother-in-law, father-in-law, broth
law, sister-in-law or any near relative who resides in the same household wit
employee or any person with whom the employee has made his or her home.
actual days to be granted in each instance shall be such as shall accommodat
reasonable needs of the employee involved, and it is expected that his/her re
sibilities shall be covered by his/her colleagues. Such leave shall be dedu
from sick or annual leave where such leave exists. If none, it shall be grante
the University. Such leave in non-accumulative, and the total amount of ber
ment leave will not exceed 5 days within any fiscal year.

## 3.10 MILITARY LEAVE

Full-time employees who are members of the active reserve of the United S
Armed Services, National Guard or Naval Militia may be granted military leav
training or other services without loss of pay for a period not to exceed 21 days pe
cal year. However, the amount of military leave granted may not exceed the p
specified in the military orders. Employees desiring military leave will submit a
of their military orders to the Director of Personnel Services and Human Rela
through the divisional vice president as soon as possible, but not later than 10
prior to departure.

## 3.11 CIVIC LEAVE

3.11.1 LEAVE FOR VOTING. The University affords all of its employees wh
registered voters time off to exercise their right to vote. An employee may use t
two hours, if necessary, to vote in a local, state or federal election during a no
work-day schedule.

41

**3.11.2 JURY DUTY LEAVE.** An employee selected for a term of jury duty or subpoenaed to attend court shall be granted leave with pay for such purposes. Evidence in the form of a subpoena or written notification shall be presented to the Director of Personnel Services and Human Relations as far in advance as is practical. The University shall have the right to request the appropriate authorities to relieve such employee of jury duty or the court appearance in any manner permitted by law; and the employee is expected to report for regular University duty when attendance at court is not required either for the jury duty or as a subpoenaed witness.

# SECTION 4.0
## EMPLOYEE STANDARDS AND PRACTICES

The goal of Alabama State University is to be an outstanding educational tution with the finest and most modern facilities and equipment available accomplish this goal, it is necessary that the University establish certain rules condition of employment, you are asked to abide by these rules.

### 4.1 SAFETY

Since the University endeavors to take every measure to ensure that it is and healthful place to work, each employee is required to practice safe work ha

Each employee is required to report to the supervisor any unsafe cond observed. Typical examples of unsafe conditions include, but are not limited t following: wet or slippery floors; equipment left in an unsafe manner; cigar cigars or ashes in wastepaper baskets; defective electric wiring, lamps or ou accumulation of oily rags in storage spaces; fire and smoking in unautho areas. No reprisal will be taken against an employee for reporting a safety viol or hazardous working condition.

Each employee is required to become familiar with the fire prevention proce within his/her department. In the case of fire, he/she should try to avoid panic move quickly by doing the following:

Leave the area and find another phone, preferably in another building.

Call switchboard operator and inform him/her of the exact location and e) of fire and sound the nearby fire alarm.

Use extinguisher and hose as necessary.

Close windows, doors and other sources of drafts.

Check for the safety of others and yourself.

Other fire details are available in the fire procedure plan for individual de; ments and areas.

### 4.2 INJURY IN THE WORK PLACE

An employee sustaining an injury on the job is required to immediately re; the injury to his/her supervisor. In the event the injury is not serious enough warrant emergency room treatment, the employee may be referred to the he; nurse in the Student Health Center. If the injury is serious enough to wan

43

emergency room treatment, the supervisor will aid the employee in getting medical attention at one of the local emergency facilities or from the family doctor. In either case, the employee is subject to being billed for medical service provided.

Each employee should advise the provider of medical service that claims due to job injuries should be filed with the group insurance carrier and not with workmen's compensation. Unreimbursed medical expenses for job injuries may be submitted to the Office of Personnel Services and Human Relations through the supervisor to be considered for payment. All claims for charges not paid for by the medical insurance or the University's policy may be filed by the employee with the State Board of Adjustment.

Each supervisor is required to provide a written report to the Office of Personnel Services and Human Relations within 48 hours of a work-related illness or injury requiring medical care but not including incidents requiring only first-aid treatment. For reporting work-related injuries and illnesses, the supervisor may use Occupational Safety and Health Act (OSHA) Form 101 or its equivalent; and for a basic log and summary of work-related injuries and illnesses, use OSHA Form 200 or its equivalent. Insurance reports, emergency treatment records or other reports are acceptable if they include (or are supplemented to include) the basic facts as may be provided on an OSHA Form 101.

Forms for recording and reporting work-related injuries and illnesses may be secured from the Office of Personnel Services and Human Relations.

## 4.3 DRESS CODE

Since fashion and mode of dress change continually, it is natural that the employee may want to change his/her style of dress to meet the custom of the times. The University asks employees to do so in moderation and in good taste. Radical departure from conventional dress or grooming is not permitted. Dress that results in distraction of other employees or disruption of the work of the department, as determined by the department head, will not be permitted. The University reserves the right to review and revise the attire code for its employees.

## 4.4 TELEPHONE CALLS

Employees shall make long distance toll calls only on official University business and then only with proper authorization.

When answering the telephone, an employee represents Alabama State University. Please greet the caller in a manner that is pleasant, courteous and helpful.

44

## 4.5 SMOKING

All buildings on the Alabama State University campus are designated as smoking areas as ordered in Montgomery City Ordinance 70-89.

## 4.6 USE OF BULLETIN BOARDS

Each department has a bulletin board to keep an employee up to da University policies and notices that are related to his/her work. The supe will show him/her its location. Only those notices approved by the depart head may be posted on the department bulletin board. Removal of notices w made only by an employee designated by the supervisor.

It is an employee's responsibility to make a daily check of the bulletin boa notices of importance concerning the University and policy matters which affect his/her work and well-being.

## 4.7 PROTECTING CONFIDENTIAL INFORMATION

Employees of the University have occasions to deal with information whi of a confidential nature. It is expected that they will always respect the confide ity of information by not discussing it with anyone except on a strict need-to-l basis. Should an employee have doubt as to whether the information he/she with is confidential, consult the supervisor for guidance. A breach of confident is in effect a breach of contract.

## 4.8 GIFTS

An employee may not accept or solicit gifts or compensation from any under any circumstances for work performed while he/she is being paid for pr ing services to the University.

## 4.9 PERSONAL AND INTEROFFICE VISITATION

Employees should refrain from receiving personal visitors, children or while on duty. Likewise, employees are asked not to visit friends in other de ments while they are on duty.

## 4.10 POLITICAL ACTIVITY

The University assumes the following position with respect to those who to engage in political activities:

45

A) University employees should be free to engage in political activities so far as they are able to do so consistent with their obligations as employees of the University.

B) Many kinds of political activity such as holding part-time office in a political party, seeking election to any office under circumstances that do not require extensive campaigning, or serving by appointment or election in a part-time political office, are consistent with effective service as an employee of the University. Other kinds of political activity such as intensive campaigning for elective office or serving a limited term in a full-time position, may require that the employee seek a leave of absence.

C) In recognition of the legitimacy and social importance of political activity by employees, the University will provide institutional arrangements to permit it, similar to those applicable to other public or private extramural service. Such arrangements may include reduction of workload or a leave of absence for the duration of an election campaign or a term of office, accompanied by equitable adjustment of compensation when necessary.

D) An employee seeking leave should 1) recognize his/her primary obligation to the University and to professional growth as an employee; 2) be mindful of the position which a leave of absence can create for the administration and for University colleagues; and 3) not abuse the privilege by too frequent or too late application or too extended a leave. If adjustments in the employee's favor are made, such as a reduction of workload, he or she should expect them to be limited to a reasonable period.

E) A leave of absence incident to political activity will not count as probationary service, and the terms of such a leave and its effect must be set forth in writing.

## 4.11 CONFLICT OF INTEREST

No employee shall:

a. Engage directly or indirectly in any business transactions or private arrangements for profit that accrue from or are based upon his or her position or authority with the University; or

b. Participate in the negotiation of or decision to award contracts, the settlement of any claims or charges in any contracts, the making of loans, or the establishing of rates, guarantees or other things of value with or for any entity in which he or she has a financial or personal interest.

No employee may for his or her own personal gain or for the gain of other or disclose any information obtained as a result of employment which is not g ally available to the public.

No employee shall use any University equipment, supplies or properti purposes other than those designated and authorized by University policies.

## 4.12  USE OF UNIVERSITY NAME

The name of the University and/or its official letterhead shall not be us any advertising or commercial publicity in such manner as to imply Univ approval. Employees who participate in interviews and surveys sponsored b side agencies shall make clear that they speak as private individuals and n employees of the University.

An exception to this policy is made in the case of an employee who publ an article or paper or engages in some other activity with credit to botl University and his or her own standing in the academic world.

## 4.13  SOLICITATIONS

Salespersons involved in nonacademic sales and all solicitors are expect obtain written authorization from the Office of Administrative Services Advancement prior to calling on employees of the University during wor hours. Such permits are granted only for purposes of University-related busi Employees should be mindful that personal business or business of outside f agencies or individuals conducted during working hours is a violation of Unive regulations. Courtesy, tact and discretion should be used so as not to needl offend salespersons and solicitors, and whenever possible or interested, emplo should make appointments outside of work time.

# SECTION 5.0
## PERFORMANCE EVALUATION

Two objective performance evaluations are required for all employees during the first 12 months of the probationary period, and one annual performance evaluation is required thereafter at the completion of each year of service. A copy of each completed performance evaluation is filed with the Office of Personnel Services and Human Relations.

### 5.1 EVALUATION REVIEW

The annual performance evaluation rating should be reviewed and signed by each employee. The employee's signature does not indicate concurrence with the contents, only that the employee was given the opportunity to review the evaluation. The employee has the right to record a documented dissent in the Office of Personnel Services and Human Relations within 10 days after the receipt of such information if there is a disagreement with the rating given. If the rating is less than satisfactory and the employee feels that it is an unfair evaluation, he/she may file an appeal through the Office of Personnel Services and Human Relations to a Performance Evaluation Review Board (see Section 8.2). Only an overall rating of unsatisfactory may be appealed, and the decision of the Performance Evaluation Review Board is final. In addition to the annual regularly scheduled performance evaluation, the supervisor at any time may review and rate an employee for sustained changes in performance or upon termination of employment.

5.1.1 EVALUATION PROCEDURE AND TIMING. Between May 1 and September 30 of each calendar year, each employee who has completed twelve or more months of service will be evaluated by the current supervisor regarding how well the employee is performing the duties and responsibilities of the position. This evaluation will review both the employee's strengths and any weaknesses, and the supervisor will work with the employee to correct any weaknesses. If it is determined that identified weaknesses cannot be corrected through this type of assistance, it may be necessary for the employee to be reclassified, which could result in a reduction in pay.

Employees newly appointed to their positions shall be evaluated twice within the first 12 months of employment in accordance with policies relating to the probationary period of employment, which are spelled out elsewhere in this Handbook.

5.1.2 EVALUATION RATING FACTORS. An employee's overall work performance evaluation will be measured using the following performance standards:

| UNSATISFACTORY: | The employee's performance falls conside below the standards for the assigned position. |
| SATISFACTORY: | The employee's performance consistently r acceptable standards for the assigned position. |
| EXCELLENT: | The employee's performance consistently exi minimum standards for the assigned positio sometimes achieves outstanding levels of p mance. |
| OUTSTANDING: | The employee's performance consistently and stantially exceeds the standards for the assi position and falls within the upper 3 perce employees working in comparable positions. |

## 5.2 PERFORMANCE EVALUATION REVIEW BOARD

A Performance Evaluation Review Board shall consist of five persons and include the Director of Personnel Services and Human Relations and one me appointed by each of the four area vice presidents. Any three members shall stitute a quorum for the transaction of official business. This committee will r complaints alleging unfair or biased performance evaluations which failed t resolved through the regular administrative channels.

Only ratings which result in an overall evaluation of less than satisfactory be appealed. Appeals must be in writing and be received by the Chair of the mittee within 10 days after being reviewed by the employee. Only evaluation f which bear the signature of the employee to signify that he/she has been revie will be accepted for appeal.

Action of the review board is final and is limited to the following: (a) certi a rating of satisfactory for the period; (b) allowing the evaluation to stand as wr or (c) declaring the employee to be "not rated" for the period and noting th the personnel records accordingly.

49

# SECTION 6.0
## DISCIPLINARY ACTIONS AND GRIEVANCE/APPEAL PROCEDURE

### 6.1 DISCIPLINARY GUIDELINES

The University is vitally concerned that all employees should have clear guidelines that will enable them to perform their duties with maximum efficiency and job satisfaction, to work effectively and cheerfully with their co-workers, and to know fully their rights as employees and their responsibilities to the University. The table that appears on the following pages identifies some of the forms of conduct that employees are not expected to exhibit while on the job. The table also identifies the specific kinds of disciplinary action that will be taken in response to cases of employee misconduct that do occur. The table is designed to serve as a guide that will enhance protection of an employee's interests, and it does not necessarily include all the forms of employee misconduct that may occur.

50

# DISCIPLINARY GUIDELINES TABLE

| Nature of Offense | First Offense | Second Offense | Third Offense | Fourth Offense |
|---|---|---|---|---|
| Use or possession of another employee's property without permission | Reprimand | Ten-Day Suspension | Termination | |
| Carelessness or Negligence | Verbal Warning | Reprimand | Ten-Day Suspension | Termination |
| Threatening, intimidating, coercing or interfering with another student or employee | Reprimand | Ten-Day Suspension | Termination | |
| Making false, vicious, malicious statements about an employee or the University | Reprimand | Ten-Day Suspension | Termination | |
| Absent from designated duty station without permission of the supervisor | Reprimand Suspension | Ten-Day | Termination | |
| Failure to complete required time and attendance record | Verbal Warning | Reprimand | Disciplinary Probation | Termination |
| Failure to follow instructions | Reprimand | Ten-Day Suspension | Termination | |
| Restricting University operations | Reprimand | Ten-Day Suspension | Termination | |
| Provoking a fight or fighting on campus | Ten-Day Suspension | Termination | | |
| Reporting for work under the influence of illegal drugs or alcohol | Termination | | | |
| Sleeping on the job | Ten-Day Suspension | Termination | | |
| Insubordination or disrespect to supervisor | Ten-Day Suspension | Termination | | |
| Falsifying official University records | Termination | | | |
| Altering time sheets | Ten-Day Suspension | Termination | | |

51

| Nature of Offense | First Offense | Second Offense | Third Offense | Fourth Offense |
|---|---|---|---|---|
| Possessing firearms or explosives on college property | Termination | | | |
| Theft of any University property or funds | Termination | | | |
| Removal of University property from the campus without permission | Termination | | | |
| Drinking alcoholic beverages on campus | Termination | | | |
| Violation of civil rights | Ten-Day Suspension | Termination | | |
| Disloyalty to the University or misrepresentation of its policies | Termination | | | |
| Willful destruction of University property | Termination | | | |
| Striking or assaulting an employee or student | Termination | | | |
| Not following internal lines of authority | Verbal Warning | Reprimand | Ten-Day Suspension | Termination |
| Speeding in University vehicles | Ten-Day Suspension | Termination | | |
| Tardy or absent without authorization | Verbal Warning | Reprimand | Ten-Day Suspension | Termination |
| Wasting time or loitering | Verbal Warning | Reprimand | Ten-Day Suspension | Termination |
| Gambling on University premises | Reprimand | Ten-Day Suspension | Termination | |
| Violation of a safety rule or safety practice | Verbal Warning | Reprimand | Ten-Day Suspension | Termination |
| Use of University facilities without specific permission | Reprimand | Ten-Day Suspension | Termination | |
| Violation of University Drug Free Workplace Policy | Termination | | | |
| Just Cause | Ten-Day Suspension | Termination | | |

52

**6.1.1 VERBAL WARNING.** A verbal warning is administered by an employ immediate supervisor whenever an employee has engaged in relatively minor fo of misconduct for which such warnings are designated or are appropriate. Ve warnings are administered in individual conference between the supervisor and employee wherein the supervisor undertakes to explain fully the nature of the v tion and the means by which the employee can ensure that the violation will no repeated. Evidence that the verbal warning was delivered is documented and sig by both parties, but these documents are retained only by the immediate superv and are not made a part of the employee's permanent personnel file.

**6.1.2 REPRIMAND.** Employees who persist in committing minor offense which a verbal warning has been previously issued or who commit more subs tial forms of misconduct will be subject to a reprimand. A reprimand is a wri statement that contains a specific description of the conduct for which the emp ee is being reprimanded. Reprimands may only be initiated by the employ immediate supervisor but must also bear the concurring signatures of each suc sive supervisor up to and including the divisional vice president or the Directo Communications and Public Affairs or the Director of Intercollegiate Athlet When an employee receives a reprimand, he or she must sign it to signify tha has been properly received and noted. One copy of the reprimand must be gi to the employee, while another copy must be placed in the employee's perman personnel file.

If an employee receives a reprimand for each of two different kinds of misc duct within a 12 month period, the employee will automatically be placed on 10 suspension. If an employee receives a reprimand for each of three different ki of misconduct within a 12 month period, that will result in termination of empl ment. Employees who receive a single reprimand may not use this action to res to the grievance procedure. But permanent employees who receive successive r rimands that result in their being placed on 10 day suspension or in being termi ed may use these actions to resort to the grievance or appeal procedure outlin elsewhere in this Handbook.

**6.1.3 TEN-DAY SUSPENSION WITHOUT PAY.** A 10 day suspension with pay is imposed upon an employee for misconduct resulting previously in a ver warning and/or reprimand or for initial misconduct that is more serious than t resulting in an initial verbal warning or reprimand. A 10 day suspension is initiatec writing to the employee and must contain specific statements relating to the misc duct or inadequate performance for which the employee is being suspended. It m also indicate the effective date upon which the suspension begins and the effect date upon which the employee is to return to active service. The time covered by suspension must cover 10 working days and not merely 10 calendar days.

53

Suspension without pay is one of several forms of Cancellation of Contract for Cause that follow very specific administrative procedures and that are dealt with in more detail later in this section of the Handbook. Employees subject to such suspensions should refer to those later pages for more specific information relating to their rights under a pending suspension action. A permanent employee may appeal the action of being placed on 10 day suspension by resorting to the University's grievance procedure explained elsewhere in this Handbook.

6.1.4  SUSPENSION WITH PAY. An employee who appears to have engaged in major misconduct for which termination of employment would normally follow may be placed on suspension with pay pending a further inquiry into the matter. Only the President has the authority to suspend an employee with pay, and when such suspensions are initiated, they must be in writing with a copy given to the employee. An employee who has been suspended with pay is not permitted to report for work until instructed to do so in writing.

Within 10 working days of the suspension, the President must notify the employee in writing regarding the results of the inquiry. If the inquiry has shown that the original charges were not valid, the employee will be reinstated to active service. If the inquiry has shown that the original charges against the employee were valid, the employee will be notified that his or her employment has been terminated effective the date of notification.

## 6.2  TERMINATION FOR DISCIPLINARY REASONS

Termination of an employee for disciplinary reasons will occur as a result of one of the following three patterns:

1) The employee has engaged in major misconduct involving, but not limited to, those forms of misconduct which are listed in this section of the Handbook and which call for termination either for the initial offense or for successive offenses.

2) The employee has failed to meet satisfactorily the terms of a disciplinary probation.

3) The employee has within a 12 month period either received three reprimands or been twice placed on disciplinary probation.

A recommendation to terminate an employee for disciplinary reasons shall be initiated by the immediate supervisor and concurred with by all successive supervisors up to and including the divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics,

before being sent to the President. Only the President has authority to actually
minate the employee, and such notice must be in writing with a copy of the n
provided to the employee. A termination of employment for disciplinary rea
may take effect upon the date of notification when in the judgment of the Presi
the seriousness of the offense is such that keeping the employee on the job w
be detrimental to the University or to the employee. On the other hand, it
President does not believe that immediate termination is necessary to protec
interests of the University or the employee, then the President will give an adva
notice of termination rather than an immediate notice of termination. Whei
advance notice of termination is given, all persons holding staff positions in the
egories of service and maintenance, skilled crafts, clerical and secretarial and t
nical and paraprofessional shall receive a two-week advance notice of terminal
And all persons holding staff positions in the categories of executive, administra
and managerial and professional nonfaculty shall receive a four-week adva
notice of termination. Compensation for the two-week or four-week period wil
deemed as advance notice.

Permanent employees who are terminated for disciplinary reasons may ap
their termination in accordance with the University's grievance procedure. I
employee resigns after being informed that he or she will be terminated for d
plinary reasons, it will still be recorded in the employee's personnel record as a
mination for disciplinary reasons. If an employee elects to resign prior to be
informed that he or she will be terminated for disciplinary reasons, his/her per
nel record will reflect that he/she resigned employment.

## 6.3 CANCELLATION OF CONTRACT

Cancellation of contract is the term used to define those administrative acti
of the University that result in a permanent employee suffering a loss of emp
ment or compensation or a temporary employee suffering a loss of employmen
compensation, prior to the expiration of a temporary appointment. Cancellatio
contract may be effected by the University only for adequate cause or for med
disability, and it may take one of the following forms: involuntary termination,
pension without pay, demotion or involuntary transfer.

### 6.3.1 CANCELLATION OF CONTRACT FOR CAUSE. The divisional
president or the Director of Communications and Public Affairs or the Directo
Intercollegiate Athletics is responsible for initiating all actions involving a canc
tion of contract of nonacademic staff employees. The following criteria and pr
dures shall be followed for such actions based upon adequate cause:

A) Adequate cause for contract cancellation shall be related directly and s
stantially to the fitness of the employee to perform the duties and responsi

55

ties that are outlined in the job description. Adequate cause includes, but is not limited to, the following: moral turpitude, neglect of duty, incompetence, inability to perform a job properly, commission of a felony or gross insubordination.

B) Prior to cancelling a contract for a nonacademic staff appointment for adequate cause, the employee's divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics shall discuss the cause for potential cancellation with the employee who, at his or her option, may have a representative present in an effort to resolve the matter informally through a mutual settlement.

C) If the matter is not resolved pursuant to subsection B above, the divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics shall, prior to the date that the cancellation becomes effective, provide the employee with a written statement notifying him or her of the decision to initiate a cancellation of contract action and the effective date of the action. The notice shall set forth with reasonable particularity the reasons which constitute adequate cause for the cancellation action. The notice shall also set forth the time and place of a hearing by a Hearing Officer.

D) Notwithstanding the right to a hearing prior to the effective date of cancellation, an employee may be summarily relieved of his or her assignment with pay, pending a final decision by the President, if the divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics determines that the continued presence of the employee at the University is a threat to the health, safety or welfare of other employees or students.

E) The Hearing Officer shall be selected from an alphabetical list of names of attorneys and/or other persons familiar with due process procedures. Such list is to be compiled by the President at the beginning of the year. For each instance involving selection of a Hearing Officer, the President shall submit the next three names on the alphabetical list. The divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics shall strike one name from the list, and the employee who is being charged will then strike a second name from the list. The name that remains shall serve as Hearing Officer.

F) The hearing before the Hearing Officer shall be conducted pursuant to the following procedures:

56

1) The Hearing Officer may hold prehearing conferences with the p
and/or their representatives to (a) simplify the issues, (b) determin
facts, (c) provide for the exchange of witness lists and documenta
other evidence and (d) achieve such other appropriate prehearing c
tives as will make the hearing fair, effective and expeditious.

2) A notice of hearing, setting forth the time and place of the hea
setting forth the specific charges against the employee and incorpor
the written statement of reasons required under subsection C above,
be served on the employee at least seven days prior to the hearing.
notice will be personally hand-delivered to the employee or sent by
fied mail to the last address of the employee that is contained in
records of the University's Office of Personnel Services and Hu
Relations. If the employee wishes to waive the right to a hearing, h
she should sign a Waiver of Hearing Form in the Office of Perso
Services and Human Relations at least two working days prior to
scheduled date of the hearing.

3) If the employee does not waive the right to a hearing, the hearing
be private. Public statements and publicity about the case by eithe
employee or the University, except for simple announcements concer
the time of the hearing and similar matters, shall be avoided so far as
sible until all proceedings have been completed.

4) Throughout the hearing, including any prehearing conferences
employee has the option of being represented by any individual or c
sel. In addition, at the request of the employee, a representative c
employee organization or association shall be permitted to attend all
ceedings as an observer.

5) The Hearing Officer shall grant adjournments to enable either par
investigate evidence as to which a valid claim of surprise is made.

6) The employee shall be afforded an opportunity to obtain necessary
nesses and documentary or other evidence. The University shall coo
ate with the Hearing Officer and the employee in securing witnesses
making available documentary and other evidence.

7) The employee and the University shall have the right to confront
cross-examine witnesses. When the witnesses cannot or will not appea
the Hearing Officer determines that the interest of justice requires ad
sion of their statements, the Hearing Officer shall identify the witnesses
close their statements and, if possible, provide for interrogatories.

57

8) The Hearing Officer shall not be bound by strict rules of legal evidence and may admit any evidence which is of probative value in determining the issues involved. Every possible effort should be made to obtain the most reliable evidence available. At the discretion of the Hearing Officer, the parties may be entitled, upon request, to submit post-hearing briefs.

9) The decision of the Hearing Officer shall be rendered promptly, and in no event more than 30 days after completion of the hearing or the date for submission of post-hearing briefs, whichever is later; shall be in writing; shall be based solely upon the hearing record; and shall include findings of fact and recommendations, if any, to the area vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics. The Hearing Officer will provide a copy of the decision to the employee. If the University elects to prepare a transcript of the hearing, copies of the transcripts shall be provided, without cost, to the employee and to the divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics. If the University elects at its discretion not to make a transcript of the proceedings, then the expense of any transcript requested by the employee shall be borne by the employee.

G) 1) Within seven days after receiving the decision of the Hearing Officer, the President shall notify the employee in writing of the action that he or she proposes to take with regard to the cancellation of contract action. If the action proposed involves a rejection or modification of the decision of the Hearing Officer, the President shall explain the reason for the rejection or modification in the notice to the employee.

2) The employee and the divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics each shall have the right to submit a written statement of position to the President. If the employee so requests, the President, at his/her discretion, may allow the employee or the employee's representative to make an oral presentation. If such a request is granted, the President shall afford the opportunity to make an oral presentation to the divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics or his/her representative.

3) Unless the President directs otherwise, the fact that the employee has appealed shall not prevent the divisional vice president or the Director of Communications and Public Affairs or the Director of Intercollegiate Athletics from taking the action proposed.

58

4) The review by the President shall be limited to the record made b
the Hearing Officer, the documents submitted to him/her pursuant to
sections 2 and 3 above and any oral presentations that are made.
President shall not consider the appeal unless the action proposed b
divisional vice president or the Director of Communications and F
Affairs or the Director of Intercollegiate Athletics does not comply
University policy and/or is not supported by the record made befor
Hearing Officer. If the President grants the appeal, he/she shall pr
the employee with such relief as may be necessary and appropriate in
of any action that may have been taken by the divisional vice preside
the Director of Communications and Public Affairs or the Direct
Intercollegiate Athletics in the interim.

6.3.2 APPEALS TO THE BOARD OF TRUSTEES. Appeals to the Boa
Trustees are limited to those cases in which the sanction imposed involves e
involuntary termination or demotion, and such appeals shall be conducted in a
dance with the following procedures:

1. Within 20 days after receiving the decision of the Hearing Officer
President shall notify the employee in writing of the action he/she propos
take with regard to the cancellation of the employee's contract. If the a
proposed involves a rejection or modification of the decision of the He
Officer, the President shall explain the reason for said rejection or modific
in the notice to the employee. The action proposed by the President
become final and binding unless, within 20 days of the aforesaid notice
employee notifies the President in writing that he/she wishes to appeal t
Board of Trustees. The employee may include with said notice a written
ment setting forth the nature and basis for his/her appeal.

2. Within 20 days after receipt of timely notice of appeal, the President wil
ward to the members of the Board of Trustees a copy of the decision o
Hearing Officer, the notice that the President sent to the employee and
employee's notice of appeal together with any accompanying written s
ment. The record made before the Hearing Officer shall be made availab
the Board of Trustees upon request.

3. The Board of Trustees shall consider the appeal as soon as possible,
under normal circumstances, not later than its next regularly scheduled n
ing following submission of the matter to it by the President.

4. Unless the Board of Trustees directs otherwise, the fact that the empl
has appealed shall not prevent the President from taking the action propos

5. The review by the Board of Trustees shall be limited to the record n
before the Hearing Officer, the documents submitted to it pursuar

59

subsections 2 and 4 above and any oral presentations that are made. The Board of Trustees shall not consider the appeal unless the action proposed by the President does not comply with University policy and/or is not supported by the record made before the Hearing Officer. If the Board of Trustees grants the appeal, it shall provide the employee with such relief as may be necessary and appropriate in light of any action that may have been taken by the President in the interim.

6.3.3. CANCELLATION OF CONTRACT FOR MEDICAL DISABILITY. The following criteria and procedures shall be followed for cancelling contracts of staff employees based on medical disability:

A) Contract cancellation because of medical disability shall be based upon medical and other evidence that, because of an injury or illness, the employee cannot continue to fulfill the terms and conditions of his or her appointment.

B) The decision to cancel a contract shall be made by the President only after the President or his or her designee has consulted with the appropriate administrators and with appropriate medical personnel.

C) Prior to cancelling a contract because of medical disability, the President or his or her designee shall discuss the basis for potential contract cancellation with the employee and/or his or her representative in an effort to resolve the matter informally through a mutual settlement.

D) If the matter is not resolved pursuant to subsection C above, the President or his or her designee shall, prior to the date that the contract cancellation becomes effective, provide the employee and/or his or her representative with a written statement notifying the employee of the decision to cancel his or her contract and the effective date of cancellation, and setting forth with reasonable particularity the medical disability requiring contract cancellation.

E) An employee whose contract has been cancelled because of a medical disability is entitled, upon request, to a review of the evidence by a Hearing Officer prior to the time that the cancellation becomes effective. Notwithstanding this right to an informal review prior to the effective date of cancellation, an employee may be summarily suspended, with pay, pending a final decision of the Board of Trustees if the President or his or her designee determines that the continued presence of the employee at the University is a threat to the health, safety or welfare of other employees or students.

F) After conducting a review of the evidence, including an opportunity for the presentation of contrary evidence by the employee and/or his or her representative, the Hearing Officer shall issue, in writing, a recommended decision

60

concerning the appropriateness of the contract cancellation. This recom
dation, together with a written report from the President, shall be transi
to the employee and to the Board of Trustees, which shall review the evic
the Hearing Officer's recommendation and the President's report before
ing a final decision on the contract cancellation.

G) An employee with a probationary or permanent appointment whose
tract is cancelled because of a medical disability shall be given a severanc
in an amount to be determined by the Board of Trustees, but in no even
than three months of current salary if the cancellation occurs during or
end of the first year of service with the University  in no event less tha
months of current salary if the cancellation occurs during or at the end
second year of service with the University, and in no event less than 12 m
of current salary if the cancellation occurs after the start of the third ye
service with the University.

## 6.4  GRIEVANCES

A grievance is an allegation by an employee that there has been a violati
provisions of these policies by the University or its agents relating to salary,
hours or other terms and conditions of employment.

A grievance may be filed by an individual employee or any number of em
ees who believe that they have been adversely affected by the same actic
actions; it may be directed against the action of one or more administrators.

Except as otherwise provided in this paragraph, all grievances shall be
cessed in accordance with the procedure set forth in Section 6.4.1. If a griev
includes an alleged violation of the University's Affirmative Action Plan, that a
of the grievance must be reported and processed in accordance with the p
dures set forth in the Plan. If the grievance deals with a matter that is subject
separate appeal procedure that is specifically referenced in this Handbook
employee must follow the procedure set forth in that section.

6.4.1 GRIEVANCE PROCEDURE.  Grievances shall be filed and process
accordance with the following procedure:

A) A grievance must be filed in writing within 21 days after the event gi
rise to the grievance or within 21 days after the employee (s) filing
grievance knew or reasonably should have known of the event giving ri
the grievance. The written grievance shall indicate the action being grie
the rule, regulation, practice or procedure allegedly violated, and the ren
being sought. The grievance initially must be filed with the director of the

61

unless the director of the unit is filing the grievance, in which case the grievance initially must be filed with the divisional vice president.

B) The director of the unit shall respond to the grievance in writing within 21 days of receiving the grievance.

C) If the director of the unit fails to respond within the required period, or if the response is unacceptable to the employee (s), the grievance may be appealed to the divisional vice president. This appeal must be made within 21 days of receipt of the response from the director of the unit or within 21 days of when that response was due, whichever occurs earlier.

D) The divisional vice president shall respond to the grievance in writing within 21 days of receiving the grievance.

E) If the divisional vice president fails to respond within the required period or if the response is unacceptable to the employee (s), a grievance petition may be filed with the President.

(F) The President shall respond to the grievance in writing within 21 days of receiving the grievance.

## 6.5 POLICIES RELATING TO SEXUAL HARASSMENT

Alabama State University is firmly committed to providing a work environment that is free of discrimination. Sexual harassment is viewed as a form of sex discrimination and as a most reprehensible offense whether committed on or off campus. Alabama State University will vigorously investigate and impose sanction when investigation confirms that sexual harassment has occurred. The University is especially sensitive toward this matter where students are involved and will not hesitate to impose the maximum sanction of dismissal where warranted. Deliberate false accusation of sexual harassment will not be condoned and may result in disciplinary action being taken against anyone who knowingly makes a false report.

### 6.5.1 SEXUAL HARASSMENT DEFINED.
Unwelcomed sexual advances, requests for sexual favor and other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or academic decisions, (2) submission to or rejection of such conduct by an individual is used as a basis for employment decisions or academic decisions affecting such individual or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile or offensive working or academic environment. Sexual harassment may be of a homosexual or heterosexual nature.

62

SEXUAL HARASSMENT MAY CONSIST OF:

- Sexually suggestive language.

- Derogatory sexual comments.

- Unsolicited touching of the body.

- Patting or pinching.

- Physical sexual assault including rape.

- Outright solicitation of sexual intercourse.

- Subtle pressure for sexual favors or social encounters.

- Demands for sexual favors or social activity accompanied by threats or ins tions that failure to submit will adversely affect one's employment, wages, conditions or academic advancement.

- Demands for sexual favors or social activity accompanied by implied or c promises that submission will result in better job treatment or academic adv ment.

    6.5.2 REPORTING INCIDENTS OF SEXUAL HARASSMENT. An indiv who experiences sexual harassment shall immediately report that fact tc Director of Personnel Services and Human Relations who also serves as University's Equal Employment Opportunity (EEO) Officer. The initial report be in oral or written form, but a formal investigation of the matter cannot begin the complaint is submitted in written form and signed by the complainan charges of sexual harassment are formally filed against any officer of the Unive at or above the level of an divisional vice president or the Directc Communications and Public Affairs or the Director of Intercollegiate Athletics EEO Officer shall within 10 days report that fact and the results of any prelim investigation to both the President and the Chairman of the Board of Trustees.

    6.5.3 INVESTIGATING REPORTED INCIDENTS OF SEXUAL HAR MENT. Prior to initiating an investigation, the Director of Personnel Services Human Relations will notify the accused person(s) of the sexual harass charge and of the impending investigation. The investigation will be non-adve al; therefore, attorneys for neither side will be permitted. The investigation mittee will be composed of three disinterested members. Two members wi appointed by either of two divisional vice presidents. The third member wi selected by the two members appointed by the vice presidents. If the two ca agree on naming a third member, the Director of Personnel Services and Hu Relations will name the third member. If the sexual harassment charge invoh student, at least one member of the committee will be a student.

The committee will interview and obtain relevant testimony from any and all persons who may have knowledge of the matter. Upon completion of the investigation, the committee will compile its findings, formulate recommendations and forward its report through the Director of Personnel Services and Human Relations to the President. The President may approve or disapprove the committee's recommendations. Should either party disagree with any sanction imposed by the President, that party may utilize the grievance or appeal procedure depending upon the sanction imposed, but only if the party is an employee within the proper classification.

## 6.6 POLICY TO MAINTAIN A DRUG-FREE AND ALCOHOL-FREE WORK-PLACE

Alabama State University has a policy of providing employees a drug-free and alcohol-free work place. Drug abuse affects all aspects of American life; it threatens the work place as well as the community. In order to promote a safe and efficient work environment, the following policy has been adopted to supplement existing personnel policies, practices and procedures.

Drug abuse interferes with an employee's efficient and safe performance of work responsibilities and reduces the employee's dependability, creating a problem for the entire University. Therefore, it is the policy of Alabama State University that the manufacture, distribution, dispensation, possession or use of illegal drugs or alcohol in the work place will not be allowed. It can adversely affect health, safety and productivity while destroying public confidence and trust. "Work place" means any office, building, classroom or property (including parking lots) owned or operated by the University, or any other site at which an employee is to perform work for the employer. An "employee" of Alabama State University is any individual receiving remuneration for services rendered, and this includes faculty, staff and students. "Possess" means to be contained either on an employee's person or in an employee's motor vehicle, tools or areas entrusted to the control of the employee. "Impaired" means under the influence of an illegal drug or alcohol such that the employee is unable to perform his or her assigned tasks properly.

All employees shall receive a copy of the Drug-Free and Alcohol-Free Work Place Policy. It is the responsibility of the Director of Personnel Services and Human Relations to distribute this written policy statement to all University employees.

As a condition of employment, the employee will abide by the terms of the policy. Any employee receiving a criminal drug conviction shall notify the Director of Personnel Services and Human Relations, the Office of Vice President for Student Affairs or the Office of Vice President for Academic Affairs of such conviction for a

violation occurring in the work place not later than three days after such co
tion, and the above offices will immediately report this information to
University President. Alabama State University, through the Office of
President for Fiscal Affairs, shall notify granting or contracting agencies withi
days after receiving notice of a criminal drug statute conviction.

No employee will report to work or will work or be present in the work p
who is impaired by any illegal drug or by alcohol. Employees who are so impa
or who possess, use or distribute illegal drugs or alcohol in the work place are
ject to the disciplinary procedures set forth in the Nonacademic Staff Handl
and Faculty Handbook, which may include dismissal.

The Director of Personnel Services and Human Relations and the Direct
the University Health Center will be responsible for coordinating regularly sc
uled drug-free awareness programs, providing printed information for dissen
tion through campus-wide publications and providing information about avail
rehabilitation or counseling resources.

## 6.7 DISCIPLINARY ACTION IN RESPONSE TO UNAUTHORIZ ABSENCES

An exempt employee who is absent without authorization will receive a pr
ed salary deduction and/or disciplinary sanction. If an employee who is in no
empt status (paid hourly) comes to work late without advance authorizat
he/she will have such lateness charged against his/her pay rate for the actual t
lost but with a minimum of one hour for each instance.

It is the responsibility of both the supervisor and employee to report to
Director of Personnel Services and Human Relations in writing all unauthor
absences.

## 6.8 GARNISHMENT OF EMPLOYEE WAGES

The University is required by state law to honor garnishments agains
employee's wages. An employee will be notified when a garnishment orde
received. He/she will be notified of the total amount due and the starting dat
the salary deduction. The amount of the deduction is determined by law or co
decree and will be taken out on a regular basis until the total debt is satisfied.

# SECTION 7.0
## TERMINATION OF EMPLOYMENT FOR
## NONDISCIPLINARY REASONS

### 7.1 RESIGNATION

An employee who wishes to resign from the University shall give written notice to the President, the Office of Personnel Services and Human Relations and the department head of his/her intention to resign. This action shall be taken at least one full pay period prior to separation. This is in addition to any leave time the employee plans to take prior to leaving the position. Failure to give proper notice may be considered as part of the evaluation for rehiring if the employee seeks re-employment at the University.

When employment is terminated, the employee forfeits eligibility for salary increases.

### 7.2 RETIREMENT

Under present Alabama law, there is no mandatory retirement age for any employees. However, an employee is eligible for retirement when he/she reaches the age of sixty and has at least ten years of service in the Alabama Teachers' Retirement System or has 25 years of service regardless of age. Please contact the Director of Personnel Services and Human Relations at least 10 days prior to your desired retirement date to complete the necessary paper work. The Alabama Teachers' Retirement System must receive the completed application at least 30 days prior to the month retirement is to become effective.

### 7.3 NONREAPPOINTMENT OF EXECUTIVE STATUS EMPLOYEES

Executive status employees include all persons holding positions of Vice President, Assistant Vice President, Dean, Director of Library and Learning Resources, Controller, Director of Computing and Information Services, Director of Physical Plant, Director of Communications and Public Affairs and Director of Intercollegiate Athletics. Persons holding these positions are employed under annual contracts that provide for a 12 month term of service from October 1 through September 30 but do not provide either a probationary period of employment or the acquiring of permanent employee status. Any executive status employee whose contract is not renewed for the next fiscal year shall be notified of this fact at least 60 days prior to the expiration of his or her employment contract. Such notice shall be in writing from the President and shall be hand-delivered by the immediate supervisor.

66

## 7.4 LAYOFFS DUE TO FINANCIAL EXIGENCY

Reductions in force that require the layoff of a permanent employee or the off of a probationary or temporary employee before the end of a specified because of a bona fide financial exigency shall be carried out in accordance the following criteria and procedures:

A) A bona fide financial exigency means unavoidable financial conditions threaten the financial well-being of the University and that cannot be allevi by less drastic means than a reduction in force. The determination of whe a bona fide financial exigency requiring the layoff of employees exists ultin ly shall be made by the Board of Trustees.

B) If the University is required to lay off employees due to a bona fide fina exigency, it shall first lay off employees with temporary appointments, ther off employees with probationary appointments and only then lay off perma employees, provided that the employees remaining at the University are q fied to meet the job needs of the University.

C) If the University is required to select individual employees for layoff f among the group of all employees with temporary, probationary or perma appointments, it shall base its selection on the following criteria in the o indicated: 1) the job needs of the University; 2) the performance evaluation the employees being considered for layoff; and 3) when the foregoing fac are substantially equal, the seniority of the employees being considered for off. Seniority for these purposes shall be determined by length of servic the University and, for employees having the same length of service, by sa grade at the University.

D) If the University is required to lay off employees due to a bona fide fin cial exigency, it shall not at the same time appoint new employees to University except in extraordinary circumstances where serious distortio the University's program would otherwise result. In addition, before layinç employees due to a bona fide financial exigency, the University shall m every effort to place the affected employees in other positions at the Univer for which they are qualified.

E) An employee selected for layoff by the University due to a bona fide fin cial exigency shall be notified by the President, in writing, of the reas requiring the layoff, including particularly the University's compliance with criteria and procedures set forth in this section. The notice shall also inf the employee of the effective date of the layoff, subject to approval by Board of Trustees.

F) An employee notified of his or her layoff by the President may appeal that decision to the President by filing a written notice of appeal within 30 days of receiving the notice specified in subsection E. The only issue that may be raised in such an appeal is the University's failure to comply with the criteria and procedures set forth in this section. After receiving a notice of appeal, the President or his or her designee shall schedule an informal meeting with the employee, during which time administrative officers of the University shall fully explain to the employee how the University complied with the criteria and procedures set forth in this section. The employee and/or his or her representative then shall be afforded an opportunity to explain how the University failed to comply with those criteria and procedures. After the meeting, the President or his or her designee shall prepare a written decision on the issues raised during the meeting, which decision shall be presented to the Board of Trustees prior to the meeting at which the Board will consider approving or disapproving the layoff.

G) An employee with a probationary or permanent appointment who is laid off due to a bona fide financial exigency shall be given either notice or severance pay in an amount to be determined by the Board of Trustees, but in no event less than three months notice or salary. Notice for this purpose shall be measured from the time that the employee was informed of the layoff pursuant to subsection E.

H) The position of any employee affected by layoff under this section shall not be filled by a newly appointed employee within a period of two years from the layoff, unless the employee affected by the layoff has been offered reinstatement, has been afforded at least 30 days in which to accept or decline the offer and has been offered a reasonable time, not to exceed one year, to report for work.

## 7.5 LAYOFFS DUE TO DISCONTINUANCE OR CURTAILMENT OF A DEPARTMENT, PROGRAM OR POSITION

The following criteria and procedures shall be followed for layoffs of employees based on discontinuance or curtailment of a department, program or position at the University:

A) Layoffs due to the discontinuance or curtailment of a department, program or position at the University shall be based upon a determination that the educational mission of the University will benefit from and be strengthened by the proposed discontinuance or curtailment. The decision to discontinue or curtail a department, program or position and to lay off employees as a result thereof, ultimately, shall be made by the Board of Trustees, upon recommendation of

68

the President, who shall consult with the appropriate employees and adm
trative officers before making such a recommendation.

B) Before laying off employees as a result of discontinuance or curtailme
a department, program or position, the University first shall make every
to place the affected employees in other positions at the University for w
they are qualified.

C) If the University is required to select individual employees for layoff
among a group of employees affected by the proposed discontinuance or cu
ment, it shall first lay off employees with temporary appointments, then la
employees with probationary appointments, provided that the emplo
remaining at the University are qualified to meet the job needs of the Univer

D) If the University is required to select individual employees from among
group of affected employees with temporary, probationary or perma
appointments, it shall base its selection on the following criteria in the c
indicated: 1) the job needs of the University; 2) the evaluations of emplo
being considered for layoff; and 3) when the foregoing factors are substan
equal, the seniority of the employees being considered for layoff. Seniorit
these purposes shall be determined by length of service at the University,
for employees having the same length of service, by salary grade at
University.

E) An employee selected for layoff by the University due to the discon
ance or curtailment of a department, program or position shall be notifie
the President, in writing, of the reasons requiring the layoff, including par
larly the University's compliance with the criteria and procedures set fort
this section. The notice also shall inform the employee of the effective da
the layoff, subject to approval by the Board of Trustees.

F) An employee notified of his or her layoff by the President may appeal
decision to the President by filing a written notice of appeal within 30 day
receiving the notice specified in subsection E above. The only issue that
be raised in such an appeal is the University's failure to comply with the c
ria and procedures set forth in this section. After receiving a notice of app
the President or his or her designee shall schedule an informal meeting
the employee, during which time administrative officers of the University s
fully explain to the employee how the University complied with the criteria
procedures set forth in this section. The employee and/or his or her repre
tative then shall be afforded an opportunity to explain how the University fa
to comply with those criteria and procedures. After the meeting, the Presi
or his or her designee shall prepare a written decision on the issue (s) ra

69

during the meeting, which decision shall be presented to the Board of Trustees prior to the meeting at which the Board will consider approving or disapproving the layoff.

G) An employee with a probationary or permanent appointment who is laid off due to the discontinuance or curtailment of a department, program or position shall be given either prior notice of termination of employment or terminal salary in an amount to be determined by the President, subject to Board of Trustee approval, but in no event less than six months notice or salary. Notice for this purpose may be measured from the time that the employee was informed of the layoff pursuant to subsection E.

H) The position of any employee affected by layoff under this section shall not be filled by a newly appointed employee within a period of two years from the layoff, unless the employee affected by the layoff has been offered reinstatement, has been afforded at least 30 days in which to accept or decline the offer and has been offered a reasonable time, not to exceed one year, to report for work.

70

# SECTION 8.0
## JOB CLASSIFICATION, SALARY SCHEDULE AND PAYROLL POLICIE

### 8.1 JOB CLASSIFICATION FOR SALARY PURPOSES

The Director of Personnel Services and Human Relations shall establish a
maintain a job description for each position title that is maintained at t
University. Each job description shall describe the broad function of the job; t
duties and responsibilities that the job is to perform; the knowledge, skills and al
ities required for the job; and the minimum training and experience required i
placement in the job. In addition, the Director shall maintain a system for classi
ing all positions for salary purposes according to the elements that are included
each job description.

Employment with the University must be in a position title that is specifica
included in the current list of position titles that are classified for salary purpose
No person will be employed under a position title that does not appear on the cu
rent list of classified and unclassified position titles unless such an exception h
been specifically approved by the President.

Reclassification of a position may be initiated by the Director of Personn
Services and Human Relations or by the employee's supervisor, but such reclassi
cation shall require the approval of both the Director of Personnel Services an
Human Relations and the President or his/her designee.

Recommendation for employment shall not preclude an agreement concernir
the classification of the position, pay rate, job requirement and pertinent conditior
surrounding an offer of employment.

### 8.2 SALARY SCHEDULE

The University's policy is to maintain a salary schedule that applies to all po:
tions and that reflects essentially equal pay for equal work. Adequate consideratic
will be given to the duties, responsibilities, skills, knowledge, abilities, educatic
and experience required for the position as well as the availability of applicants fc
the position. However, all nonacademic employees will be paid by positions rathe
than degrees held.

The University will endeavor to provide compensation that is competitive wit
other universities and with other local private and public employers. Compensatio
policies must be reconciled within budgetary constraints, the financial status of th
University, budgetary authorization of the Board of Trustees and the requirement

71

of the Fair Labor Standards Act. When state and/or federal appropriations warrant, adjustments will be made by factoring from each salary step.

A salary and wage plan, developed and published at least annually by the Director of Personnel Services and Human Relations, shall provide minimum and maximum wages for each position in the established list of job classifications. The Director of Personnel Services and Human Relations verifies that the salary of each employee is within the salary range prescribed in the pay plan and within equitable steps in comparison with other employees in positions within the same classification. Once a pay plan is approved and adopted by the Board, any deviation must have prior Board approval.

New employees who meet the minimum training and experience requirements for a position will normally be employed at Step 1 of the salary schedule unless their training and experience exceed the minimum requirements, in which case they may normally be appointed up to Step 4 of the salary schedule. With specific justification, the University President may authorize initial appointment up to Step 7, and any initial appointment higher than Step 7 must have approval of the Board of Trustees. Any deviation from this policy must be fully documented in writing and made a part of the individual's personnel record.

When funding levels permit, periodic salary advancement within established ranges shall be based on satisfactory performance in the position. When advancements are made on the salary schedule, all permanent employees shall advance by categories on an equitable basis. When an employee reaches the final step in his/her salary range, additional salary increases will not be authorized unless there is an across the board salary increase or a new salary schedule is approved.

Compensation for monthly paid employees working only a portion of the month will be prorated to the actual period worked.

## 8.3 PAYROLL POLICIES AND PROCEDURES

Unless notified otherwise, payroll checks for monthly paid employees are issued on the last workday of each month. Payroll checks for hourly paid employees are issued biweekly on alternate Fridays. Checks are distributed from the Office of the Controller to the address of record unless otherwise stipulated by the employee.

Attached to each payroll check is a statement showing current gross and net earnings, itemized deductions and year-to-date earnings and deductions. Alabama State University is required to deduct federal and state income taxes in accordance with prevailing rates as well as F. I. C. A. taxes and contributions to the Teachers' Retirement System of Alabama.

72

Other deductions include:

A.  Rental payments for campus housing, if applicable

B.  Any amount which is due the University from a financial obliga incurred by an employee who does not otherwise make timely paym campus traffic fines included

C.  Adjustment for failure to satisfy the time and/or workload requireme employment specifications

D.  Group Health Insurance Premiums for dependents, if requested

E.  Salary or annuity options available under provisions of the Inte Revenue Code by arrangement with the Controller and servicing in ance company of the employee's choice

F.  Any single installment payroll deduction for payment of annual du professional organizations of the employee's choice

G.  Deposits to savings accounts or payments to loan accounts for membe the Montgomery Teachers Federal Credit Union

H.  University Center assessments (exempt employees only)

I.  Contributions to charitable organizations and agencies participatin approved campus-wide, fund-raising campaigns

The Payroll Office will process up to three voluntary payroll deductions employees without cost. This free service may be discontinued if, in the opinic the Controller, the volume of work exceeds manpower capability.

An employee employed on less than a 12 month basis may elect to be pai 12 monthly installments beginning with the first check by giving written notic the Controller before the 20th day of the first month of employment. One elects to be paid on a 12 month basis cannot later request to be paid on a less 12 month basis during that fiscal year. Withholding taxes shall be deducted progressive rate.

Compensation for an exempt employee working only a portion of a month be calculated for only the portion of a month served in accordance with the fol ing formulas:

(a)  New Appointment

(1)  If the effective date of appointment is on or before the 15th of month, the monthly salary for that month will be determined by this mula:

73

monthly rate X 8 X No. of working days prior to
173.33                  date of appointment.

(2) If the effective date of appointment is on or after the 16th of the month, the monthly salary for that month will be determined by this formula:

monthly rate X 8 X No. of working days in pay status
173.33

(b)  Termination

(1) If the effective date of termination is on or before the 15th of the month, the monthly salary for that month will be determined by this formula:

monthly rate X 8 X No. of working days prior to
173.33                  date of termination

(2) If the effective date of termination is on or after the 16th of the month, the monthly salary for that month will be determined by this formula:

monthly rate X 8 X No. of working days remaining
173.33                  in the month

74

# SECTION 9.0
## OTHER EMPLOYEE BENEFITS AND SERVICES

### 9.1 GROUP MEDICAL AND DENTAL INSURANCE

The University offers a program of group medical insurance which inclu both basic medical and major medical insurance for employees and their de dents. This plan does not include insurance for loss of income resulting from ness or injury.

Group medical insurance is available only to full-time employees whose ten employment is nine months or longer. It is used to assist in covering the co medical services, surgical services and hospital services, and the cost of the in ance to cover the employee is paid for entirely by the University. The extent of fringe benefit may be modified if budgetary restraints so dictate.

Participating employees may include their dependents for coverage under group medical insurance plan, but the full premium cost for dependent cove will be charged to the employee. Dependents may include the spouse an unmarried children from date of birth up to 19 years of age. In addition, an un ried child who is a full-time student may be insured up to age 23, and all step dren and legally adopted children are considered eligible dependents. An emp ee's parents and other relatives are not eligible for dependent coverage e though the employee may contribute to their support.

An employee's coverage will be effective on the first of the month coinci with or following the date of employment except for pre-existing conditions 270-day waiting period may be required for pre-existing conditions and for rem of tonsils and adenoids.

The University also offers dental insurance with the cost of a single prem coverage paid entirely by the University. The extent of this fringe benefit may modified if budgetary restraints so dictate. Employees may at their option chase dependent family coverage. The total premium for family coverage is by the employee. The qualifications for dependent coverage are the same as the group medical insurance coverage.

### 9.2 GROUP LIFE INSURANCE

Group Term Life and Accidental Death and Dismemberment Insurance included in the Group Life Insurance Plan.

A Group Term Life Insurance/Accidental Death and Dismemberment Plan is provided to all full-time employees with the premiums paid for entirely by the University. Eligible employees may purchase at their own expense additional term life insurance above the amount provided in the basic plan. Employees who wish to purchase additional term life insurance should contact the Office of Personnel Services and Human Relations.

## 9.3 RETIREMENT PROGRAM

All employees who work more than 20 hours per week on a regular basis and who have completed one year of service with the University are required to become members of the Teachers' Retirement System of Alabama. Each employee is required to contribute 5 percent of his/her total annual salary to the Retirement System, and the amount paid into the system by each employee is supplemented by an allocation from the state legislature. After 10 or more years of creditable service, a member has a vested interest in the Teachers' Retirement System and may apply for a monthly benefit check upon reaching age 60. If an employee terminates his/her service with the state, he/she may request a refund settlement of the amount he/she has contributed to the system plus a portion of the earned interest depending on length of membership service. However, a terminated employee may retain membership in the System for 5 years after which the Director of the Teachers' Retirement System will return to him/her the accumulated benefits, thus ending membership in the Retirement System. Lump sum withdrawal of contributions prior to retirement may be subject to a penalty under the Tax Reform Act (TRA, 1986). Upon retirement, accrued sick leave must be applied toward service retirement credit as explained elsewhere in this Handbook.

Information concerning the Retirement System may be secured from the Teachers' Retirement System of Alabama, 135 South Union Street, Montgomery, Alabama 36101. Brochures are also available to employees from the University Office of Personnel Services and Human Relations which describe the general organization of the system, contributions to the system by the employee and the four optional benefit payment plans.

In addition, the University offers its permanent and probationary employees a payroll deduction plan to purchase Tax Sheltered Annuities (TSA) and Individual Retirement Annuities (IRA). If an employee elects to participate, his/her gross income will be reduced by an amount not to exceed the extent allowable under Section 403 (b), 415 (e), or 457 of the Internal Revenue Code as amended. The employee will owe federal tax on the annuity contributions for the year in which they are withdrawn. Employees may contact the Office of Personnel Services and Human Relations for further information regarding this program.

76

## 9.4 SOCIAL SECURITY BENEFITS

The University and the employee contribute equally to the cost of S
Security benefits. The deduction from the paycheck and the amount contribute
the University are deposited to the credit of the employee with the state agenc
Social Security according to federal regulations. Upon becoming eligible, one
draw both Teachers' retirement and Social Security retirement simultaneously.

## 9.5 UNEMPLOYMENT COMPENSATION

Employees shall be eligible for unemployment benefits provided by
Alabama Unemployment Compensation Law. Application for unemployment
pensation benefits is initiated at the local State Employment Services Office.

## 9.6 ENROLLMENT IN UNIVERSITY COURSES

All full-time employees may enroll in a credit-yielding course taugt
Alabama State University. Such training is subject to the approval of the imme
supervisor, the Vice President for Fiscal Affairs, the Personnel Director and
University President. The University will waive the tuition cost for one course
semester.

The enrollment of an employee in University courses will be at no additi
direct cost to the University, and this benefit may be used only if there are stu
slots available in the course. Employees may not attend classes during their
mal duty hours unless a special waiver is granted. Such waivers are granted on
an employee is seeking to complete the last course required for graduation,
the course is only offered during normal duty hours. In such cases the employe
still expected to complete additional hours of work outside of the normal
hours to make up for those regular hours of work not completed.

## 9.7 USE OF CAMPUS FACILITIES AND SERVICES

An important aspect of working at Alabama State University is the availab
of numerous and varied facilities and services.

While the facilities at the University are primarily for use by students, emp
ees are allowed and encouraged to use certain facilities.

Cost center managers are responsible for all nonexpendable property
equipment in their area. Prior to assuming leadership, he/she will immedia
report to the University Property Officer any property that is lost or missing foll
ing a joint inventory.

## 9.8  POLICE AND CAMPUS SECURITY

The Department of University Police and Security operates to protect the health and safety of all University personnel and visitors. Its police officers are authorized by state law to make arrests, keep intruders away from the campus, prevent trespassing and prevent damage to the property and grounds of the University. They control all traffic and parking on campus, and the tickets that they issue for traffic violations are enforced in the Montgomery City Courts. The department issues campus parking permits and registers all campus vehicles, and it handles all reports of disorderly conduct, theft, lost and found property and emergency incidents.

University Police Headquarters is never closed and officers are on duty around the clock. Employees are requested to report law enforcement difficulties to the department and to let the department report the problem to the City Police as necessary.

## 9.9  LIBRARY SERVICES

The library is located in the Levi Watkins Learning Center. In order to use the Library, one will be required to identify himself or herself as an employee with an identification card. A valid I. D. card must be presented in order to check out materials.

## 9.10  PARKING FACILITIES

All vehicles operated on the campus by employees must be registered and bear a decal prescribed by University regulations. The decal may be purchased at the Cashier's Office . Acceptable proof of vehicle ownership (tag, receipt, bill of sale or insurance papers) must be presented at the time of purchase. Parking decals cost $25 dollars and are good for 1 year beginning in August. Only 1 decal may be issued to an employee. The cost of a parking decal may change if such is determined to be in the best interest of the University.

Parking areas on campus are designated by parking signs. To park in a particular space, an automobile must display a decal corresponding to the area sign. Cars parked in areas not corresponding to the decal may be ticketed or towed away at owner's expense without warning.

Campus parking restrictions are in effect from 8:00 a.m. until 5:00 p.m. each day, Monday through Friday. All other parking restrictions on streets and in other areas such as loading zones, fire plugs, dumpsters and the President's parking spaces are in effect 24 hours each day. Violations are shown on the ticket, and

78

tickets must be paid within 72 hours of the date received or the fine will increased. The violations may be appealed within 72 hours to the Univer Hearing Officer located in Councill Hall, Room #16.

All fines are paid at the Cashier's Office in Councill Hall, and fines and pe ties not paid will be deducted from payroll checks.

Parking areas are not to be used for distribution, solicitation, benefit sale other activities of a similar nature by employees of the University.

The University assumes no liability for loss or damage to automobiles or the contents while parked on University premises.

## 9.11 COMPLIMENTARY TICKETS

Complimentary tickets are not issued to employees of the University for adr sion to intercollegiate or other events for which a charge is made. Season ticket and frequently special tickets, are provided at special reduced rates for employee of the University. These may be purchased from the Athletic Business Services the University Cashier.

## 9.12 EMPLOYEE IDENTIFICATION CARDS

Every person who is appointed to any position of employment at the Univers must possess an employee identification card. These cards are prepared and issued by the Department of University Police and Campus Security and should carried by the employee at all times.

79

